(No. 20472.--

THE CITY OF CHESTER, Appellee, *vs.* F. C. KENNEDY *et al.* Appellants.

*Opinion filed April 23, 1931—Rehearing denied June 4, 1931.*

A. D. RIESS, and P. K. JOHNSON, for appellants.

WM. H. SCHUWERK, (HOSEA V. FERRELL, of counsel,) for appellee.

Mr. CHIEF JUSTICE DUNN delivered the opinion of the court:

This appeal is from the judgment of the county court of Randolph county confirming a special assessment by the city of Chester to pay the cost of a street paving improvement. The court overruled the legal objections, and, a jury having found that the property of the objectors was not assessed more than it would be benefited or more than its proportionate share of the cost of the improvement, entered a judgment of confirmation, from which three of the objectors, F. C. Kennedy, John Darwin and T. W. Tackenberg, have appealed.

The city of Chester is situated on the east bank of the Mississippi river, partly on the low land between the bluff and the river, where the three railroads of the town and their stations, the steamboat landings and various business buildings are and where about a fourth of the city's population reside, and partly on the bluff, where the court house, various business buildings and the residences of about three-fourths of the city's population are. The improvement in question is about 2600 feet long and extends from the court house at the top of the bluff, where it connects with an existing pavement, to Water street, which is parallel with and close to the Mississippi river. The difference in elevation of the termini is about 240 feet. The width of the roadway to be paved is generally 26 feet. For many years Lower Chester, under the hill, has been connected with Upper Chester, above the hill, by a roadway, which has been improved by being macadamized and oiled, and it is the improvement of this roadway, with a change of about 200 feet in one part of its course, for which the ordinance which is the basis of this proceeding provides. Its course during part of the way up the hill is sinuous and its grades are steep, since the average for the whole distance is about 9.00 per cent. Starting at Water street with a grade of 11.38 per cent it extends along Ferry street at right angles to Water one

block to Randolph street, into which it enters by a right angle to the right, along which it extends at a grade of 5.2 per cent for nearly a block, then, with a curve to the left, crosses Angle street, which is at right angles to Randolph, diagonally on a grade of 8.33 per cent, and beyond Angle street enters and crosses diagonally lots 45 and 44 and the end of lot 110, fronting Harrison street, lot 110 being the property of the Church of the Assembly of God, on which is a church. Harrison street is parallel to Water and Randolph, and after crossing Angle street and the three lots beyond it the roadway enters Harrison street, with a slight curve to the right, with a grade of 9.06 per cent, and then, with a greater curve to the left, crosses Harrison street diagonally, and continues across lots 11 and 12 of block 31 on a grade of 9.44 per cent to Hancock street, which runs at right angles to Harrison, Randolph and Water streets. The grade there is 10.31 per cent. The roadway continues on Hancock street a little over a block, until it reaches Buena Vista street, into which it turns at a right angle to the left. It continues in Buena Vista street to the upper terminus at the court house and the existing pavement, the grades at various points in Buena Vista street changing to 9.05, 8.62, and finally 4.3 per cent.

The objection made to the confirmation of the assessment is that the ordinance is unreasonable, and therefore void, because the grade of the proposed finished roadway is so steep and excessive as to be dangerous for use, unsafe for ordinary traffic and for safety in inclement weather, because the foundation or road-bed for a considerable part of its length is subject to slips, slides and sinks and will not hold in place the finished pavement, which will therefore not be permanent but will be temporary, of uncertain value and without benefit to the objectors' property; because the pavement is to be built on the steep down-grade of the bluff, whose steep, rocky hillsides and loose, sinking and sliding character do not permit of improvement and increase of

value; because there is no necessity for the proposed improvement, for the reason that there is a macadamized highway in good condition along the entire route sufficient for the use of the public.

The following partial sketch will help to an understanding of the scope of the improvement and the location and relation of the appellants' property with respect to it:

T. W. Tackenberg is the owner of lots 21 and 22 on the lower side of Randolph street, extending from Ferry street to Angle street, of lot 5, fronting 20 feet on the same side of Ferry street as lots 21 and 22 and extending back 100 feet, and of lot 14, fronting 36 feet on the opposite side of Ferry street, 100 feet deep, all marked "T" on this sketch and assessed at $2154.20. John Darwin is the owner of

lots 28 to 31, inclusive, on the other side of Randolph street from Tackenberg's lots, and of lot 20, fronting 70 feet on the opposite side of Ferry street from Tackenberg's Randolph street lots, and running back 100 feet, all assessed at $1416.40 and marked "D." F. C. Kennedy owns parts of two lots beyond Harrison street, assessed at $1116.20 and marked "K." The curved roadway extending from Ferry street along Randolph street and from the northeasterly side of Randolph street to the northwesterly side of Hancock street is called the Hillside road. Before 1927 the roadway used between the upper and the lower town came down the bluff along Hancock street to Harrison and there turned to the left along Harrison.

The chief contention of the appellants is that the improvement can only be temporary because the foundation upon which it is to be built in part is continuously sliding toward the bottom of the hill. Where this sliding process has been going on the formation is shale upon soapstone, and when it becomes water-soaked it shifts downward, destroying whatever structure may rest upon it as a foundation.

The evidence concerns generally that part of the Hillside road on Randolph street between Ferry and Angle streets and that part beginning a little beyond Angle street and extending across Harrison street, including the strip of about 200 feet which crosses the lots owned by F. C. Kennedy and the lot owned by E. A. Crippen at the corner of Harrison and Hancock streets. Tackenberg's lots 21 and 22 are on the lower side of the roadway where it runs along Randolph street and Darwin's lots 28 to 31 on the upper side. One of the oldest slides to which the evidence referred occurred about forty-five years ago and affected these Darwin and Tackenberg properties and the roadway between. It turned over two of Tackenberg's buildings, burst two cisterns and took the road in front clear across to the Darwin lots. The present roadway in front of Tackenberg's lots is supported in part by a loose rock retaining

wall four feet high, and in another part by a like retaining wall which is 10 feet high. Both are bulging. On the Darwin property above the roadway, and about 60 feet from it, is a cistern with its walls cracked, and there is also a crack in the ground about four or five inches wide. The most recent extensive slide occurred in 1927. It crossed Hancock street, which the old roadway then used, the lower end of the Crippen lot and a corner of the Kennedy lot, and extended downward across Harrison street, where the old roadway then followed that street. It then extended along the lower side of the proposed roadway for about 135 feet, extending toward its center a maximum distance of 13 feet, leaving also a depression about four feet deep and about 10 feet square on the upper side of the proposed roadway, just across from a church which stood below the roadway on lot 110. This landslide forced an abandonment of a part of the road in Hancock and Harrison streets around the corner and made necessary the acquisition of the 200 feet of new roadway from Hancock to Harrison. At the time of this slide Kennedy had a brick house on his lot, over the former site of which the new roadway passes. After the slide the walls of this house were cracked. Under the window sills it was cracked about half an inch wide. The foundation of the church of eight-inch concrete was cracked and the church is leveled by the use of wood between it and the foundation. Heine's house on lot 111, across from Kennedy's lot 10, moved downhill in the slide. The concrete walk on the upper side of Harrison street, commencing on lot 9 and extending across the place where the new roadway is located, dropped from three to five feet and the new roadway is carried across it on a fill of about 4.4 feet. L. A. Kennedy testified: "There was a building on lot 11, right in the roadway of the proposed slab. The slide cracked from foundation to rafters several times. I know of slides every year or so. I do not know how much of the present roadway sank. The slides would occur in

rainy or snowy season—usually after a hard rain—at intervals of maybe five or six years; would move roadway toward river. There was a brick building and three-story frame on lot 45. The brick building was cracked and torn down. The frame building was jacked-up forty or fifty times. Slides affected roadway. The Heine house slid over 150 feet toward the river. I do not know about present conditions—how it is held up. There was a cistern. It shot up out of the ground and had to build two or three steps to get to the cistern. Here is a culvert that was affected by the slide. That culvert would empty into Angle street. All buildings of entire two blocks were torn down and moved. The landside, and nothing else, affected them."

There have been numerous minor slides in the past affecting the roadway. George Wood, seventy-eight years of age and a former alderman, who had lived fifty-four years in Chester and was familiar with the road, testified there had been twenty or twenty-five slides during the time he was on the board, most of which, so far as the road was concerned, could be, and were, repaired. Tackenberg testified that the road slid off and on nearly every year—some years more and some less; that it was the hardest road to keep up the city ever had. Others testified to particular damage done by one of these slides which had occurred about fourteen years before. Faverty, seventy years of age, who drove a hack up and down the road for twenty-eight years, testified that he noticed the crack the night before. That slide went under Kennedy's walk on the upper side of the roadway and down as far as the church. The roadway went down so people could not pass. Faverty's house slid down the hill. Dave Smith, who had been street commissioner for three or four years, testified that in the slide of fourteen years before about 15 or 18 feet of the present roadway was affected, at the worst point going down six or eight feet. That slide occurred before the church was built. The surface is still in an unstable condition. Dave Smith tes-

tified that the year before he testified a slide occurred in front of the church. It was filled in. Fred Rieckman, a teamster who was then working on the street, testified that this slide in front of the church affected the street—about 15 feet from the board walk, on its upper side. Further down the street, near Angle street, there was a hole down which Rieckman ran his shovel to its full length. The hole was on the upper side of the street near the board walk.

Besides this testimony of witnesses to the actual physical condition for forty-five years, the appellants called William McCarty, D. O. Thomas and F. W. Brickie. McCarty lived in Chester and had been county surveyor of Randolph county for many years. He was acquainted with the road for forty-five years and in his testimony gave a description of the present condition of the Hillside road from Ferry street to Hancock street. He also testified to the effect of various slides upon the road—particularly that in the spring of 1927. At this time the road on Hancock street sank four or five feet below the surface so that it could not be used and the road had to be abandoned there and the new road bought. The slides usually come in a wet spell or heavy snows, when the ground gets wet. Then the soil slides down the hill away from the bluff. Under this particular slide there is soapstone, and if you go below the slides it can be seen. In the rainy season it crumples up and goes to pieces. It is not a good foundation for anything. He was of the opinion that the road located as it is would be likely to move and slip. If concrete was there it would go, too. It has done it and he knew of nothing to prevent its doing it again. The present road from the top of the hill to the bottom is macadam, has been oiled by the city and is traveled from the river to the court house. He made borings on and along the roadway where the slide occurred, drilling through clay of various degrees of thickness and finding no rock bed but finding shale and soapstone, and when these are wet they become soft and soapy. He testified that the

biggest slide he knew of was right by the church about two or three years before, right under the roadway, and that in his opinion the whole hill is underlaid with shale, and outside of this slide there are indications of slipping all the way up the bluff.

D. O. Thomas, a civil engineer, who is and for fifteen years has been superintendent of highways of St. Clair county, testified that he has investigated the proposed line of paving between Hancock and Ferry streets and become familiar with the physical conditions of the soil. He examined the outcroppings of shale and rock, and also borings, and found a very standard condition that exists along the Mississippi river bluffs. This slide is a very common slide, caused by an underlying material. When the water comes in the detritus, the loose material gets in from above and naturally seeks a level. The shale below Harrison street is what is called by geologists the upper drift. He stated as to the practicability of placing the concrete slab described in the specifications on a foundation bed of that kind—simply on the surface of the soil with that stratum—that it is not satisfactory. His judgment was that it will not be permanent. These slides will continue to occur until the cause is cured, and the cause is water on the stratum of shale. There is nothing in these plans in the way of drilling that would tend to prevent it from pulling anything away. There is nothing in the way of wire netting or rods that would prevent this slide. When the foundation is weak there is no use to put re-inforcing—the foundation moves away and the pavement moves. Assuming that in a period of forty years, at intervals in times of rainy seasons, the present location of the roadway has slid so as to lower or move substantial parts of the roadway, his opinion was that the condition will continue until the cause is cured. There is nothing to cure it that he had been able to find. The improvement would not be permanent—not on a stable foundation. It would not be a good engineering project to lay

this on a flat surface on this roadway. The cost, in view of the terrain and the results that would follow, would be excessive and impracticable to the abutting property owners and the damages would far exceed the benefits to that property. He testified further that he did not know about a slide in the near future. The whole thing, you might say, is guesswork. He would say it would be unstable. The part of the highway from Ferry street to the church is giving away now. He was down there and looked at it. It will not be long before it will cave into the street. He looked at the corner of Randolph and Angle streets. There is a retaining wall crumbling down now and the first wet weather will cave it in. It is a very old wall but is not straight up and down. It is bulged. When you have these unstable foundations like this at rest they will go a long, long while, and when you disturb them by putting a slab on you are liable to start them moving again, and it may take only a little extra weight to do it. That has been his experience. If slides have affected the roadway between Angle street and lot 44 and have moved and injured buildings and broken sidewalks he would say it would not be a good foundation but would be likely to give way. A fill of five feet on top of a slippage would be an unstable foundation and not a permanent piece of work. It is all on an unstable foundation. He had four similar cases to this due to sliding, where they put a fill on halfway, and he referred to these slides. Hard roads are built along these slides and last fifty or one hundred years. In Alton there are some that have lasted years and years, and in St. Clair county two are pushing out. If placed on active slides they will not remain permanent. This is an active slide. If the slide north of Harrison street has not moved in forty years he would say it would not be active now, but he thought it had been moving lately in the highway on Harrison to Angle street. It had broken into the highway and he thought it a very active slide.

Mr. Mein, a civil engineer living in St. Louis, engaged now on concrete work for the Missouri Pacific Railroad Company, who has had twenty-four years' experience in engineering, twelve with the Missouri Pacific, testified: "From my experience we have had plenty of cases with slides—shale and similar material—that can be made permanent for road-bed. To do this it is necessary to get down and get the water out of it—drain it off. I have had no experience in highway work but would not want to put a piece of railroad work on that without treating it. I saw the specifications here and found no arrangement for subdrainage—nothing that would tend to make a permanent foundation for road-bed work. Part of the foundation as located would be permanent. There is one small piece that does not look good to me. Assuming that the part between Angle street and lot 12, along the line of slab as shown on objectors' exhibit "B," there had occurred, at intervals along portions of that, slides during the past fifty years, carried away portions of the highway and carried away buildings and cracked the building near the center of the slab and cracked and broke sidewalk across line of proposed street, and this condition has prevailed over that period of time periodically, and assuming there is shale bed with loose soil on top, with rock and dirt fills, in view of slides and soapstone foundation, if that stuff is disturbed you do not know what might happen. I have witnessed a disturbance of this kind. In view of those conditions it would not be a permanent road-bed until it is drained. If you drain it I do not think there is any reason why the shale should become active. You have to get deep enough to get the water on the shale. All the water that falls, taken off the surface, would not affect it one way or the other. I am testifying from my experience on the railroad. I do not think the weight has anything to do with it."

F. W. Brickie, a highway engineer with seven years' experience in concrete and highway construction, testified in

response to hypothetical questions, assuming the facts testified to by the witnesses for the objectors that there would not be a common and safe foundation to construct a concrete highway, there is· nothing in the construction that would make the concrete slab permanent. The small amount of concrete would not prevent it from sliding, and it is not a permanent or safe foundation.

E. H. Wegener, mayor of the city for eight years, and other citizens, presented a somewhat different view of conditions, their testimony tending to show that the effect of slides upon the road was not so great as the testimony for the appellants indicated. The mayor ascribed the necessity for much of the work done on the road to its washing by surface water and to the normal settling of fills. He testified that during the last eight years there had been no slide on the proposed improvement from Buena Vista to Water street except the slide at Harrison street, and that it had not been necessary at any time during his eight-year term to repair any sunken place or slide on that highway, except that the week before he testified he ordered dirt hauled on a five-foot fill, made necessary by the water washing a ditch there, and six or seven loads were hauled. The fill had settled not over a foot. This was right in front of the church and was due to a washed place. At a place along in front of the church it would slide about a foot or so for a distance of 20 feet under that fill. About six or eight loads of dirt and rock were put in opposite that point. The fill made was about four or five feet wide and 35 or 40 feet long. There was no slide there. It settled since the fill was made. There never was a slide where that fill was made. The testimony of five other witnesses, residents of Chester, one of whom had been superintendent of streets since May, 1927, and had served a two-year term before that, was of a somewhat similar nature and was general in character.

P. S. Wilson, a civil engineer for thirty years, with experience as engineer of railroad maintenance and construc-

tion and as municipal engineer engaged in water plant, sewer and paving construction, testified as an expert that he had examined the location of the proposed improvement along Buena Vista and Hancock streets (the Hillside road) and south to Water street. He had examined the outcroppings in the immediate vicinity and found occasional outcroppings of what appeared to be original foundation of limestone, noticeable on the bluff side of the street. On the lower side there is not so much. He considered the present condition of the present highway a stable foundation. From his examination of the soil and outcroppings he thought the foundation under the section of the road upon which the proposed slab was to be placed to be a stable foundation. There were no indications or anything in the way of outcroppings that would be observed that would make it an unstable foundation for the proposed highway. He did not make any borings. He knew what was beneath the top soil. He did not go into any cistern or basement but examined conditions along hillside and outcroppings and found exposure which presumably leads back under the bluff—he did not know. He further testified that his reasons for believing the hillside afforded a sound base were that the indications were that all of these slips running up-hill have been in a V-shaped ravine that heads up on the side of the hill. As this goes up the sides converge where these occur at the base of the hill. The base of the slip was greater and as succeeding slips occur the sides draw and become shorter and shorter, and since the last slip they have reached the summit, and the ground lying above is not going to be affected. The amount of over-burden is heavier near the bottom of the hill and continues thinner and thinner, so that there is not the depth of material left on the upper reaches of the hill and less weight, and conditions for weight are removed as you get toward top of hill. Movement being generated by moisture coming down through shale, the accumulation of water would be heavier at the

bottom of the hill. The higher you go the water does not accumulate and make this condition possible. He had examined the fill several times from the point where the present Hillside road crossed the Kennedy lots and saw no indications of slippage or continuation of slide on any part of this highway.

Thomas G. Dunn, a civil engineer of twenty-three years' practice along the Mississippi river from St. Louis to Cairo, testified that the character of the bluff was practically the same all the way between those two cities. He had inspected the location of the proposed improvement and looked over previous slides in the neighborhood of the church—the south side of the road from Hancock to Ferry streets. He did not find any outcropping of shale. From his knowledge of conditions in reference to slippage as he observed them in Chester south of the line of the improvement his opinion was that the foundation underlying the proposed improvement was stable. On further examination, cross and redirect, the following questions were asked and answers given: He was asked, "Assuming a soapstone base, the detritus on which moves from time to time when it rains so as to move down the bluff and makes steps showing the past slippage, what would you say about that if that condition existed? Would it be bad engineering?" His answer was: "Yes; if that condition existed, it would." On redirect examination he was asked: "Taking into consideration the amount of rain in the spring of 1929 and assume that a part of the hillside located here in Chester would slip to some extent in 1927, and from 1927 there has been continuous traffic in the road located over the particular slip, and considering the amount of rain in 1929 and assume there has been no slippage since 1927, in your opinion has the underlying stratum come to a rest?" He answered: "Yes. Under these conditions I would consider it good engineering to build a highway. I would consider the foundation good under those conditions. I did not find any indication of

slippage lying north toward the top of the Chester bluff. That indicates to me that the volume of material subject to slipping has slipped and there will be none further." On re-cross-examination he stated: "Assuming that on different occasions in the past, in addition to the slippage two years ago, a slide has occurred of detritus on a soapstone base, and during the past year along this line of slippage along the middle of the highway to be used as a base, that would not be a safe foundation."

Taking all this evidence together it is not convincing that in the area affected by the slides the foundation has become stable. Some slides have been more destructive than others, and some, besides the damage to the road itself, have been destructive of property both above and below the road. The bluff from the river to the court house is a steep hill, which has been subject to landslides recurring at various places and different times for many years—forty-five years ago, twenty-five years ago, fourteen years ago, in 1927, and later. Some have been more destructive than others, and besides damaging the road have injured or destroyed property both above and below the road. The formation of the ground, its constitution under the surface of shale and soapstone and the character of this formation have been testified to. The weight of the judgment of the highway builders derived from their experience is that the foundation is uncertain and insecure and that it cannot be made safe without the provision of proper drainage, for which provision is not made in the plans for the construction of this improvement. It is claimed by the appellee that there has been no material slip for fifty years except for a small part of this road, and that was in 1927 at the corner of Hancock and Harrison streets, and the road there has been abandoned and the new roadway located further up the hill on a secure and stable foundation. Whether the foundation is secure and stable is left in very serious doubt by the evidence in this case. It is true that roads are built over mountains

all over the United States, but it is also true that great care is taken to see that those roads are built on solid foundations.

While the necessity of a local improvement, its character and location, the method of construction and material used are committed to the judgment of the city council, its judgment must be exercised in a reasonable manner in view of the circumstances and surrounding conditions. Special assessments for local improvements are necessarily based upon the idea of equivalent. benefits to the property owner and necessarily imply the idea of permanency in the improvement. The improvement of a street for which a special assessment may be made must provide a permanent construction by which the adjacent property will be benefited in its market value. It needs no argument to show that the permanence of a road depends upon the fixedness of its foundation. The evidence shows that the ground from Hancock street along Harrison, past the church, is unstable and has been subject to slides and settlement, that the slide of 1927 extended under the roadway on which it is proposed to construct the road for a distance of 135 feet, reaching to the middle of the proposed road, and that this unstable condition cannot be avoided except by making provision for the drainage of the road so as to carry off the water, that such provision can be made, but the plans for the construction of the road make no provision for it. The plans for an improvement must be complete before an assessment can be confirmed for the payment of its cost. An assessment will not be sustained for an incomplete improvement in the expectation that by the future action of the city council further work will be authorized necessary to complete the improvement. The objection of the appellants that the ordinance is unreasonable and arbitrary because it does not provide for a permanent foundation should have been sustained.

The judgment is reversed and the cause remanded, with directions to sustain such objection.

*Reversed and remanded, with directions.*