Capitol Building Company and Walgreen Company, Appellants, v. City of Chicago, Appellee.

Gen. No. 43,654.

Opinion filed February 5, 1947. Released for publication February 21, 1947.

SCHUYLER & HENNESSY, HOWARD F. BISHOP and GEORGE P. NOVAK, all of Chicago, for appellants; HOWARD F. BISHOP, GEORGE P. NOVAK, EDWARD J. HENNESSY and JAY STOUGH, all of Chicago, of counsel.

BARNET HODES, Corporation Counsel, for appellee; JOHN J. MORTIMER, JOHN C. MELANIPHY and FRANCIS S. LORENZ, all of Chicago, of counsel.

Mr. Justice Kiley delivered the opinion of the court.

This is an action to recover for damages which plaintiffs claim they suffered as a result of the construction of the subway in North State Street, Chicago, Illinois. The Building Company first brought suit in the Circuit Court for damages based upon demolition of the Capitol Building. Thereafter it and Walgreen, its lessee, sued in the Superior Court for damages based upon cost of repairs to a successor building. These suits were consolidated in the Circuit Court. There, after trial without a jury, judgments were entered against plaintiffs. They have appealed.

The Building Company in 1937 became owner of the fee in, and the improvement on, the northeast corner of State and Randolph Streets, Chicago. Its ownership arose out of reorganization proceedings in the Federal Court. The improvement was the Capitol Building, built about 1892. It was 19 stories high and covered substantially all of the plaintiff's property about 170 feet north on State and 114 feet east on Randolph streets. It weighed about 30,000 tons and was set upon so-called ''spread footing foundations.''

The demolition of this building took place between May and the latter part of June in 1939. The cost was $76,000. Construction of the new building was begun immediately thereafter and was completed December 5, 1939. The Building Company's contention as to the Capitol Building is that if it were not for the subway, the building would not have been demolished and, accordingly, plaintiff should have its fair, cash market value at the date of demolition; or that it should recover the demolition cost because it was bound to minimize its damage, and the alternative of demolition, that is, the shoring of the building, did not assure safety. As to the new building, its position is that construction of the subway caused the underlying soil to shift and building walls, etc., to become cracked and

otherwise damaged. This is also the basis of Walgreen's action for damage to its leasehold.

We must decide whether the court properly decided that demolition was not proximately caused by the subway construction and that plaintiffs derived benefits from the subway sufficient to offset whatever such damage, if any, was done to the new building as a result of the subway construction. Plaintiffs contend that if any benefit did arise it cannot be used as an offset.

The court found that the demolition was not caused by the construction of the subway, but by the Company's decision to eliminate its non-profitable operation of the Capitol Building and substitute a profitable operation in the form of the successor building. · It further found that the Building Company did not perform its duty to minimize the damage to the Capitol Building; that a prudent person would have taken necessary precautionary measures; and that allowance of damages for shoring would be to indulge in the supposition that the Building Company had not demolished the building. It went on to find furthermore, that should this latter finding be erroneous, a fair estimate of the damage would not be the cost of the demolished building, but the estimated cost of protective measures which is $50,000. The court finally found that the Building Company benefited to the extent of $75,000 which was more than sufficient to offset any damage for which defendant might be liable.

██ ██ The complaint alleged that the Building Company consulted with expert engineers and architects and determined that adequate shoring would cost in excess of $200,000 and would not assure safe and sound support and maintenance of the building. The court found, and we think correctly, that this allegation was not sustained by the evidence. Only one expert engineer testified for the Building Company that he examined the building foundation about May 1, 1939.

He did not testify that he was consulted by plaintiff. He said he had no figures on the cost of shoring "until recently." He made no bid on the shoring work after his inspection. The only architect consulted by the Building Company testified on behalf of the defendant. His testimony does not support the allegation. He said he considered his firm's shoring recommendation was safe. The low bid on the shoring specifications was $49,660.00 with a contingent additional estimate of about $4,000.00. In a letter written to holders of certificates of beneficial interest in the Building Company, written in December 1938, the cost of shoring was estimated by the Building Company at $75,000 to $80,000. We conclude that the court's finding on this question of fact was proper. What the Building Company's witnesses testified to in retrospect, has no bearing on the point.

The court found that the proximate cause of the demolition of the Capitol Building was the substitution of a profitable building operation for a nonprofitable, and that the subway construction was not the proximate cause. If this finding stands, we need not consider any question of damages arising out of the demolition.

The record shows that July 27, 1937, the directors of the Building Company were authorized to employ architects to prepare sketches for a two story building; that in August and September 1937 and in March and June 1938, the architects prepared sketches and plans for the new building; that June 1, 1938 the directors authorized spending $3,000 to promote the new building; that officials of the Building Company in July went to New York City pursuant to the promotion; that in October its representative went to Detroit seeking tenants for the new building; that in October 1938, bids were received for construction of the new building; that December 2, 1938, the directors voted for construction; that December 20, a resolution was passed

authorizing new financing for demolition of the Capitol Building and construction of the new building; that in January 1939, the Walgreen lease was made for the new building; that the new financing was effected in February; and that in March the demolition contract was signed.

The subway ordinance was passed November 3, 1938. In April 1939, the Building Company served notice on the City of its intention to demolish the Capitol Building to "minimize" the damage. The contract for the State Street section was made September 13, 1939 and work was begun at the southern extremity two days later. The work in front of the Capitol Building was done between November 27, 1940 and February 10, 1941. December 16, 1938 the directors of the Building Company authorized the taking of bids for shoring of the Capitol Building. The letter to the certificate holders written December 23, heretofore referred to, notified them of a January 1939 meeting to take action for securing a loan for the demolition and new construction. It gave the financial condition of the Capitol, and the financial prospects of the new building. It referred to the $75,000 to $80,000 cost of necessary shoring and the decision of the directors to eliminate that cost through the new construction. The reasons for the decision were then given: deterioration and obsolescence of the Capitol Building; no prospect for profitable operation of its upper stories; possibility of mortgage default through lack of certainty and continuity of tenancies because of the building's character; requisite replacement of the building in any event in the near future, and the consequent impossibility of advantageous new leases; and the greater financial security under new construction.

The net operating profit of the Capitol Building after depreciation for the year ending May 31, 1938 was $5,203.51. The same net profit for 11 months ending April 30, 1939 was $10,897.85. These figures do not

include mortgage payments nor interest on certificates of indebtedness. Including these figures the operation shows a loss. The net operating figure of the new building for the year ending May 1, 1941 was $78,-658.33. The same net for the following two years was $94,299.11 and $105,650.66.

There was testimony in behalf of plaintiff that the subway construction was common knowledge ''early in 1937.'' This was to prove the motive for demolition. Engineer De Leuw testified for defendant that his first report on a State Street subway was in 1923 and that an ordinance therefor was passed in 1930.

We believe we have recited sufficient evidence to show that we would not be justified in disturbing the trial court's finding as to proximate cause.

■ The Building Company contends it should recover at least the amount of shoring which would have been required had it not demolished the Capitol Building. We think the trial court properly found that damages could not be allowed on this supposititious base. Cases cited by the Building Company on anticipatory damages do not apply. In those cases the improvements, for protection of which damages were sought, were not demolished.

■ We have come to a consideration of contentions related to the new building. These contentions can be more expeditiously disposed of by considering first whether there is any merit to plaintiffs' contention regarding benefits. The court found that the subway benefited the property in the amount of $75,000. Plaintiffs argue that the benefits cannot be offset: (a) because they arise from a service over whose operation and future, the defendant has no control; and (b) that benefits accruing through acts of third persons cannot, as a matter of law, be offset.

The court committed error in permitting De Leuw to testify to future subway systems and connections with existing subways. This was purely speculative.

We cannot for that reason, however, conclude that the subway involved in this case is an incomplete improvement so as to come within *City v. Kennedy,* 344 Ill. 224. Trains were operated in the State Street section unrelated to the balance of the Initial System of Subways.

The subway operation in State Street commenced October 17, 1943. There was testimony from which the court could reasonably infer that the subway brought approximately 2,079,594 additional people in front of the new building during the first 11 months operation. The expert's testimony regarding the added value to the property because of this subway ranged from nothing to $250,000. Plaintiffs' experts attributed the increased value to the general rise in the real estate market. Defendants' experts attributed it to the subway. The testimony referred to renders *Washington Ice Co. v. City of Chicago,* 147 Ill. 327 and *Clear Creek Drainage v. Railway Co.,* 264 Ill. 640, inapplicable.

Subway tubes constructed by the City cannot be considered by us separate from operation of trains therein. We believe that we must be realistic in approaching the question of certainty of benefits arising out of operation of trains by an agency other than the City. Trains were being operated in the subway in the Spring of 1945 during the trial, and are still in operation. The subway and operation are inseparable in State Street. This is not the case of a City seeking to diminish its wrong by separate benefits third persons might provide as in *City of Chicago v. Lemoyne,* 119 Fed. 662; and *Nelson v. City of Atlanta,* 138 Ga. 252.

What we have said about inseparability of the subway tubes and the operation of trains applies also to the contention that any benefits should be measured as of the time when the tubes were dug. It is our view that the benefits must be measured by the subway in operation.

In conclusion we approve the finding of the trial court with respect to the benefits. The damage claimed for injury to the new building by both plaintiffs is approximately $6,000. It is sufficient for us to say that we think the record discloses more than enough benefits to offset these claims.

We believe that we have considered all the points necessary to this decision. For the reasons given the judgment is affirmed.

*Affirmed.*

LEWE, P. J., and BURKE, J., concur.