BOHN v. SALT LAKE CITY et al.

No. 5257.   Decided January 23, 1932.   (8 P. [2d] 591.)

*Badger, Rich & Rich,* of Salt Lake City, for plaintiff.

*Shirley P. Jones, A. W. Watson,* and *W. A. Fraser,* all of Salt Lake City, for defendants.

*E. A. Walton* and *P. T. Farnsworth, Jr.,* both of Salt Lake City, amici curiae.

EPHRAIM HANSON, J.

This is an original proceeding brought in this court on notice to the defendants, by which the plaintiff, as a citizen and taxpayer on his own behalf and of others similarly situated, seeks a peremptory writ of prohibition to prevent Salt Lake City and its board of commissioners from consummating or awarding proposed contracts for the construc-

tion of a system of storm sewers, for the reason that the proposed contracts contain provisions which are alleged to be illegal and wasteful. The issues are made by the demurrer to the amended petition.

At this point we deem it proper to acknowledge our appreciation to Mr. P. T. Farnsworth, Jr., and Mr. E. A. Walton, members of the bar of this court, who, by our request, appeared as friends of the court and participated in the oral argument and have each furnished us a helpful brief on the questions here involved.

The amended petition shows that Salt Lake City has undertaken to construct a system of storm sewers, and that such storm sewers are a much needed, and when constructed will be a beneficial, public improvement. From what is alleged it is shown that such storm sewers will enhance the safety to life and property throughout the city, and will, to that extent, promote the welfare of its inhabitants. The commissioners of Salt Lake City approved and adopted certain plans and specifications which they had caused to be drawn up for the proposed sewers, and caused an estimate of the cost of the construction and installation of the entire project in accordance with approved plans to be made. This estimate found that the cost of the construction of the proposed sewers would be $600,000.

At a special bond election held October 27, 1931, Salt Lake City was authorized to create a bonded indebtedness in the sum of $600,000 for the purpose of obtaining the necessary funds with which to construct the proposed public improvement. In calling the election no other or additional purpose or reason why such indebtedness should be created was submitted to the electors.

The proposed system consists of several separate and distinct units that have no direct relation to each other in their construction, and which will be, in their operation, entirely independent of each other.

After inviting public bids for the work to be done according to the restrictive plans and specifications approved by

the commissioners, and a proposed contract containing the same restrictive provisions, separate contracts for four of such units have been awarded, and work is being done thereunder, and, unless the defendants are prohibited by the order and judgment of this court, defendants will award contracts containing the same restrictive conditions for the construction of the remaining units of the system.

The provisions which the defendants insist shall be inserted in the contracts and of which complaint is made, in brief, are as follows: The contractors agree (1) so far as possible, there being no substantial and material difference in price to them, that all materials shall be Salt Lake City products and manufacture, and, if not procurable in Salt Lake City, then Utah products and manufacture, and if not procurable in Utah, the contractor shall have the right of selection; (2) that all excavating, loading, and back filling shall be done with hand labor, except that teams and tractors may be used for plowing and loosening the materials to be moved; (3) that contractors shall rotate all common labor, and, so far as practicable, all other labor once each week and shall not employ any workman more than two weeks in any month, nor shall they employ any workman in any month who has had two weeks work from any source during any given month if there are other men who are unemployed and available. An agency is set up by the commissioners to register all laborers with reference to such desired information, such agency shall not refuse registration to any able-bodied citizen of the United States who has been a bona fide resident of Salt Lake City for the past year; (4) preference in employment shall be given to citizens of the United States or those having declared their intention to become such, and particularly residents and heads of families of Salt Lake City; (5) eight hours shall constitute a day's labor; (6) that $3.50 per day shall be paid as a minimum wage.

It is averred that, by requiring all excavating, loading, and back filling to be done by hand labor to the exclusion of the use of mechanical trench diggers and other mechanical de-

vices, the cost of the whole project will be unreasonably and unnecessarily increased to the extent of $35,000, and that it was so estimated by the defendants when making up the cost of the project. In respect to the provision calling for "rotation of labor" much is alleged in the petition of an uncertain and equivocal character. There is an absence in the amended petition of direct assertions of fact in reference thereto such as were made in oral argument when the case was submitted. It is alleged that the defendants estimated that this provision for the rotation of labor enlarged the cost approximately $20,000, but that in estimating the cost on the separate units this sum was not allocated to such units, but that this feature will make a substantial increase in the cost of the proposed improvement; that the prospective contractors had no opportunity to submit bids with this provision eliminated; that with this provision eliminated the cost of the entire project would be approximately $20,000 less.

At the time the cause was submitted, however, it was urged in oral argument that this particular stipulation, if inserted in the contracts, would increase the cost of the entire project to the extent of $20,000. In answer to that statement the city attorney said not a word in respect to the sufficiency of the pleading in that connection, but, in substance, did say that legally it could make no difference; that assuming that this feature of the proposed contracts would increase the cost of the entire project to the extent of $20,-000 it falls in the same class, and will be controlled by the same principles, as the provisions calling for hand labor to the exclusion of machinery which he admitted will increase the cost of the project to the extent of $35,000.

Therefore, in our consideration of the case, we have taken it as admitted that the cost of the proposed storm sewers will be increased to the extent of $55,000 by reason of the insertion of the provisions calling for hand labor and for rotation of labor.

Other allegations in the petition are to the effect that the insertion of "each and all" of the foregoing restrictive provisions as terms of the proposed contracts will materially increase the cost of the construction of the proposed improvements.

In respect to the minimum wage it is asserted that some labor can be obtained in the Salt Lake City market for $3.00 per day, although substantially all contractors are paying $3.50 per day for common labor. It is shown that Salt Lake City and Utah, in common with the rest of the United States and other civilized nations of the world, are in the midst of an unprecedented business depression that has caused an unemployment situation that threatens to become a menace. It is alleged that all of said provisions are illegal and wasteful.

From the facts before us, the direct and primary commitment resting with the city and its commissioners by law is the construction of the storm sewers in order to provide a much-needed public improvement. It should be needless to say that the unemployment situation is something collateral to the object and purpose sought to be accomplished by the construction of the storm sewers. In view of what was stated in oral argument and what has been mentioned in the written briefs by counsel, we may here observe that there is always a demand for a certain amount of "common labor" that is incidental to the construction of any public improvement of the consequence of the proposed storm sewers, even when the method of construction admits of the freest competition, that made it desirable from an employment standpoint to have the storm sewers constructed independently of the method adopted.

It is not only obvious, but it is specifically admitted, as well, that the very unusual specifications in respect to the employment and rotation of hand labor were inserted in the proposed contracts on the city's instance for the purpose of creating employment. We then have a situation before us where the city and its commissioners, in discharging the

obligation resting on them by law to build and construct the proposed storm sewers, are insisting that the unusual and restrictive specifications be made a condition of the proposed contracts, which they frankly admit will enlarge the cost thereof to the extent of $55,000. It is not urged that this extra expenditure adds anything to the value or to the merit of the work to be accomplished. It is frankly admitted that it does not. The decision to make this extra expenditure was not the result of any consideration tending to advance or promote the interest of the storm sewers, but was motivated entirely by considerations affecting the unemployment situation. These statements are all conceded.

The action taken by the city in the foregoing respects is challenged by the averments of the petition as being wasteful and illegal. We shall treat the illegality as going to the city's authority (1) to make the work of constructing the sewers subject to a condition which in no wise enhanced the value or the merit of the sewers, but is inspired solely by a purpose of alleviating in part the unemployment situation, a wholly collateral condition to the objects and purposes sought by the construction of the storm sewers; and (2) the diversion of a special fund.

This, then, calls for a consideration of the city's authority in the premises.

By general law providing for the organization and classification of cities, Salt Lake City is given express authority to construct, and keep in repair, drains and sewers, and to regulate the construction and use thereof. Comp. Laws Utah 1917, § 570x37. This specific grant of power carries with it such power as is necessarily and fairly implied or incident thereto. 1 Dillon Municipal Corps. (5th Ed.) § 237. Implied and incidental powers, so far as material to the present case, may be said to include those necessary to give effect to powers expressly granted. 1 McQuillin, Municipal Corps. (2d Ed.) § 367, p. 915 and § 368, p. 921; *Ogden City* v. *Bear Lake, etc., Co.*, 16 Utah 440, 52 P. 697, 41 L. R. A. 305; *Salt Lake City* v. *Sutter*, 61 Utah 533, 216 P. 234; *Amer-*

*ican Fork City* v. *Robinson* (Utah) 292 P. 249. It may here be stated that Comp. Laws Utah 1917, § 570x87, frequently referred to as the "General Welfare Clause," does not enlarge or annul the powers conferred upon the city by special grant. *Malone* v. *City of Quincy*, 66 Fla. 52, 62 So. 922, Ann. Cas. 1916D, 208; 1 McQuillin, Municipal Corps. (2d Ed.) § 368. In Dillon, Municipal Corps., § 239, the author states the rule as follows:

"The rule of strict construction does not apply to the mode adopted by the municipality to carry into effect powers expressly or plainly granted where the mode is not limited or prescribed by the legislature, and is left to the discretion of the municipal authorities. In such a case the usual test of the validity of the act of the municipal body is whether it is reasonable, and there is no presumption against the municipal action in such case."

In reference to this phase of the question it is said in McQuillin, Municipal Corps., vol. 1, p. 917:

"As relates to the exercise of powers it is generally regarded that municipal corporations have none of the elements of sovereignty; and they cannot go beyond the powers granted them, and that they must exercise such granted powers in a reasonable manner. These are legal propositions, well settled, and are everywhere enforced by judicial judgments. As put by Chief Justice Marshall: 'A corporation being a mere creature of the law, possesses only those properties which the charter confers upon it, either expressly or as incidental to its very existence.'"

Controlled by these elementary and well-settled principles, and keeping in mind that the city is engaged in carrying into effect a given power authorizing it to provide a system of storm sewers, it is plain that the city's action in insisting that the labor specifications we are now considering be made a condition of the contracts and proposed contracts for the sole and admitted purpose of alleviating in part the unemployment situation carries it far beyond the orbit of the power it is ostensibly asserting. Its action in this respect is wholly without authority and therefore illegal. We say again that it is not contended that

the provisions in question were inserted in the proposed contracts to enhance or promote any interest pertaining to the construction, character, or condition of the storm sewers. The only justification offered for the insertion of such provisions as conditions of the contracts is that of the employment situation. The very able counsel for the city frankly states in his reply brief that "these provisions are proper in view of the present conditions and present conditions only." The action of the city in respect to such provisions being without authority renders it unnecessary to consider the question of the reasonableness of its action in respect thereto.

It is urged by Mr. E. A. Walton, amicus curiae, that by reason of the foregoing labor provisions inserted in the proposed contracts there is a direct diversion to the extent of $55,000 from the fund created by the sale of the sewer bonds. The Constitution of Utah, art. 14, § 5, provides:

"All monies borrowed by, or on behalf of the State, or any legal subdivision thereof, shall be used solely for the purpose specified in the law authorizing the loan."

We have already stated that the labor provisions are inspired solely by considerations affecting the unemployment situation, and it is admitted that this expenditure of $55,000 will add nothing to increase the value or merit of the storm sewers and are inserted as a provision of the contract for the sole purpose of alleviating in part the unemployment situation. If, peradventure, it should be asserted that all of the $55,000 was to be spent for labor that went into the construction of the sewers, and for that reason it cannot be said in point of truth or fact that there was a diversion of such money to any purpose other than that for which the fund was created, we should be compelled by the admitted facts to say that it was but a thinly veiled effort to do by indirection what cannot be done directly. We have no difficulty in coming to the conclusion that there is a plain diversion to the

extent of $55,000 from a fund specifically created by the sale of bonds for the purpose of constructing a system of storm sewers for the purpose of affording employment for the unemployed. This cannot meet the sanction of the law. There is no contention made here on the part of the city to the contrary, and for such reasons this contention must be upheld.

The validity of the provisions in respect to the minimum wage is also brought in question by the issues before us. The power of the city to make such restrictions is directly challenged. There is apparently some conflict of authority as to whether a municipality may prescribe a minimum wage. The decisions divide largely, if not wholly, upon the extent of authority conferred by statute upon municipalities in the respective jurisdictions. The power to fix a minimum wage and to prescribe the hours that shall constitute a day's labor are quite generally regarded as an exercise of the police power. *State* v. *Tibbetts*, 21 Okl. Cr. 168, 205 P. 776; III McQuillin Municipal Corps. (2d Ed.) § 1081; *State* v. *Livingston Concrete Bldg. & Mfg. Co.*, 34 Mont. 571, 87 P. 980, 9 Ann. Cas. 204. This power is inherent in the state.

"A municipal corporation has no inherent power to enact police regulations, but derives it solely from the legislature, and consequently can exercise only such police power as is fairly included in the grant of powers by its charter." 19 R. C. L., § 108.

We are referred to a number of decisions from jurisdictions where the charter powers of municipalities are far more comprehensive than is the case in this state. As illustrations, counsel has cited *City of Milwaukee* v. *Raulf*, 164 Wis. 172, 159 N. W. 819; and *Malette* v. *City of Spokane*, 77 Wash. 205, 137 P. 496, 51 L. R. A. (N. S.) 686, Ann. Cas. 1915D, 22, and has placed considerable stress upon the very able and learned arguments made therein all of which we can and do approve, but inasmuch as the charter powers of municipalities in these cases were so much more comprehensive than we have in this state—in fact, both

decisions refer to and speak of the "Home Rule Act"—they are not at all apposite to the question we are now considering in view of our statute. There is in this state no express or implied power conferred upon a municipality which directly or by implication authorizes a city to dictate to a contractor the wages that he shall pay his employees. It is, however, contended by way of argument that the city might have done the work without letting it out on competitive bids and could then fix a wage of $3.50 per day. Assuming, of course, that $3.50 is a fair wage that might be true, but that is not the case before us. But even so, we do not think it a true analogy to assume that it has the like right to dictate to its contractors the wages they must pay their workmen. In this jurisdiction, inasmuch as municipalities have none of the elements of sovereignty in exerting their given powers, we think the provision in the proposed contracts with respect to the minimum wage must be ruled out.

The power and right of Salt Lake City to impose restrictions in the proposed contracts that give preference to heads of families of Salt Lake City is also fairly brought in question under the issues before us. In considering this question it should be kept in mind that the public policy of this state is fixed primarily by the Constitution of the state and the legislative enactments and to a very inconsequential extent by the decisions of this court. There is a statute in this state bearing directly upon the proposition we are now considering. Comp. Laws Utah 1917, § 4865, provides:

"In employing workmen in or on the construction of public works by the state, county, or municipality, or by persons contracting with the state, county, or municipality, preference shall be given citizens of the United States, or those having declared their intention of becoming citizens. In each contract for the construction of public works the provisions shall be inserted to the effect that if the provisions of this section are not complied with the contract shall be void."

It is thus seen that the statute, in the employment of labor on public works, whether by contract or otherwise, has given the preference to citizens of the United States and

those having declared their intention to become citizens. But the city, in letting the contracts, has imposed conditions that preference be given to residents of Salt Lake City and who are heads of families. It is thus obvious that the city by so doing imposed a preference not embraced nor included in the statutes, and contrary to the statute restricted and limited the preference to heads of families of Salt Lake City. The city was, as we are, bound by the statute and by the policy so declared by the state, and which may not lawfully be enlarged or restricted. This provision of the contract cannot be sustained.

From what has been said it is obvious that the writ prayed for should be granted.

Let the peremptory writ be granted.

STRAUP, J. (concurring).

In determining whether the writ should or should not be granted, it is important to keep in mind and not minimize the matter in hand. The board of city commissioners submitted to the qualified taxpayers and voters of the city, at an election called for such purpose, the proposition of issuing and negotiating $600,000 of bonds with the proceeds of which to construct a storm sewer and drainage system. In doing so, the commission acted within its undoubted power and jurisdiction. Such proposition was submitted as similar propositions are and as heretofore have been submitted for the exclusive purpose of the contemplated improvements. It is not claimed that the proposition otherwise was submitted to the voters. But it is alleged and asserted that some persons interested in maintaining the affirmative of the proposition, by public speech, talks over radios, and articles published in newspapers, urged that the bonds be voted for to now construct the contemplated improvements so that the city, because of the financial and industrial depression, might give employment to a large number of men out of employment and who are unable to maintain themselves or those dependent upon them; and that it was requested by a

committee appointed by the President of the United States and by local committees that states and municipalities provide work for the unemployed by the construction of public works and improvements, all of which by briefs and arguments are pressed upon us with much zeal and earnestness. However, in determining the purpose for which the proposition was submitted to the voters, we are not justified in taking cognizance of or considering such campaigning whether in favor of or against the proposition. While we judicially may notice the existence of the depression and because thereof a large number of persons are out of employment, yet, in considering the purpose for which the proposition was submitted to the voters to bond the city, we must be guided by that purpose for which the board of commissioners by its call submitted it, which was to construct the contemplated works exclusively for a corporate and municipal purpose and for the use and benefit of the city and of its inhabitants to be derived from the construction and use of the improvements.

Further, it is not alleged nor made to appear that in any of the speechmaking or campaigning in favor of the proposition it was urged or claimed that the construction of the works was to be on a basis other than on a reasonable or at an economical and practical cost, nor is it claimed that the committee appointed by the President of the United States or any other committee or that any one urged or contended that public improvements or public work should be made or done on any basis other than an economical and practical cost. Though it be argued and assumed that, because of the depression and of the conditions of unemployment, voters voting for the bonds did so to construct the contemplated works now so as to give employment to those out of employment, yet it may not be assumed or implied they did so upon any understanding or consent that the construction of the works was to be on a basis other than on a practical and economical one, and certainly not on any basis of waste, or of a diversion of the funds, or by the applica-

tion of any part of them to some collateral purpose or to anything not directly incident to the construction of the works themselves. Mindful must we also be of local and state-wide public demand that public expenditures be reduced as far as practicable and not increased by additional revenues unless actually necessary, and that all public expenditures be made in the most practical and economical manner.

It may readily be conceded that the commission had a sound discretion in estimating or approving estimates of the cost of the proposed and contemplated works, as to the kind and quality of material to be used, the manner in which the works were to be constructed and the character and workmanship thereof, the making and specifying of plans and specifications, accepting or rejecting bids for the proposed works and in respect of other particulars relating thereto; and that the exercise of such a discretion may not judicially be interfered with except upon allegations and proof of fraud or bad faith, arbitrariness, caprice, or abuse. Of course, where there is no power or authority to do a particular matter or thing complained of, or as to the manner in which it is done or threatened to be done, or admittedly is done not at a reasonable or practical cost but at an unnecessary and substantially increased cost to promote some object or purpose it has no authority to do, no discretion or good faith is involved. The city undertook to construct the sewer not by letting one contract for the whole project, but by letting separate contracts for separate and complete portions thereof. Four of such contracts on proposals for bids had been let from $8,000 to $79,000 each when application was made for this writ, which contracts it is alleged the city, unless restrained, will carry out and will let the same kind of contracts to do the remaining portions of the project.

In submitting proposals for bids for the construction of portions of the works already let, and in contracts entered into and to be entered into, provisions were and will be inserted that all "excavating, loading and back-filling shall

be done with hand labor, except that teams or tractors may be used for plowing and loosening the material to be removed"; that "in the employment of workmen, common labor and all other labor to the extent practical shall be rotated once each week"; that an agency for the unemployed was to be appointed by and to be under the sole direction of the board of city commissioners, and, if workmen unemployed and available for work through such agency, "the contractor shall not employ any workman more than two weeks in any one month, nor retain or employ any workman in any one month who has had two weeks' work from any source during said month, and that he will establish and pay the minimum wage of $3.50 per day for an eight-hour day, and that, except as otherwise hereinafter provided—(if the contractor is unable to meet his requirements for skilled labor from the agency he shall have the right to employ such necessary skilled labor from among others of Salt Lake City who are bona fide residents)—all labor is to be employed by him from such agency as the Board of Commissioners shall designate"; and that in employing workmen "preference is to be given to bona fide residents and heads of families" in Salt Lake City. In pursuance of such provision it is alleged that the city designated and required the contractor to employ all workmen, not only through the agency, but also from those who have been bona fide residents of the city for more than one year last past.

Then it is alleged that the city, in making estimates of the cost of the construction of the works upon which proposed bids were to be submitted, based such estimates on the condition that all excavating, loading, and back filling were to be done by hand labor as well as all other work so far as practicable, which was estimated by it to cost $35,000 more money than it would cost if such requirements were not exacted, and by considering other provisions complained of, including the rotation of workmen which was alleged and by the demurrer admitted to be an additional cost of $20,000 in

the construction of the works; and in oral argument it was admitted by counsel for the city that the provision as to the rotation of workmen stood on the same basis as the provision relating to hand labor. However, and as is readily apparent, the chief and alleged objectionable features of the provisions complained of—and all of them by the petition for the writ are inserted and complained of—are because they were imposed in the proposals for and in soliciting bids in view of them, and by contracts let and to be let all are required to be carried out. That all the provisions, including the rotation of workmen, were contained in proposals for and upon which bids were solicited and contracts let and to be let in view of them, is alleged and admitted. That, too, indisputably is shown by a copy of the proposals submitted and a copy of contracts let and to be let. Hence, it in effect is alleged that by imposing such provisions and conditions in proposals for and soliciting bids, and in contracts let and to be let, especially because of the provisions relating to hand labor, the rotation of workmen and requiring the employment of all workmen through the agency, the construction of the project will cost $55,000 more money than it would cost if such provisions were not imposed and required to be carried out. And it specifically is alleged and admitted "that the insertion in said contracts and proposed contracts of each and all of the hereinbefore described provisions has materially increased the cost to be paid and which will be required to be paid for the completion of said project and that had said provisions, or any of them, been eliminated from the said contracts and proposed contracts, bids substantially less in amount would have been received for the doing of said work and will be received for the doing of said work for which said contracts have not as yet been let," and "that approximately 90,000 eight hour day shifts for common labor will be required to be consumed in performing the said entire project pursuant to the terms, conditions and provisions contemplated by the said defendants, whereas by the method of using tools, machinery and equipment and

eliminating the said provisions of the contract as hereinbefore set forth not more than one-third of the said number of eight hour day shifts will be consumed," which, at $3.50 for an eight-hour shift, the minimum wage required, will cost more than $55,000 to complete the project, than if such provisions had not been imposed and required to be carried out.

It thus is urged by the petitioner for the writ that the board of commissioners, by imposing and requiring the performance of such provisions, exceeded its authority, breached its trust, failed to perform its duties imposed by law, committed and threatens to commit waste, diverted and threatens to divert funds and proceeds derived from the sale of the bonds to a purpose collateral and not incident to the real purpose for which the bonds were voted and negotiated, and rendered the contracts invalid. While at the oral argument of the cause it was freely admitted by counsel in opposition to the writ that under normal conditions the commission could not lawfully impose such provisions, yet it is urged that, because of the existing emergency due to the financial and industrial depression and of the unemployment of a large number of men, the city under its police power was authorized and justified in imposing such provisions. However, it, under Comp. Laws Utah 1917, § 819, as amended by Laws Utah 1919, c. 14, is also urged that the city was not required to submit bids or to let contracts to do the proposed work, inasmuch as the improvement was not "to be paid for out of the general funds of said city," but was to be paid for out of a special fund derived from the sale of the bonds and which under no circumstances could lawfully be paid or turned into the general fund of the city. Hence it is contended that the city without submitting proposals for bids and without letting contracts could directly have made the improvements itself by purchasing all material and employing all labor on such terms and conditions as it saw fit and to the same extent that an individual or private corpo-

ration might do in building or constructing similar improvements or structures.

We need not now inquire into that for the reason the city did not pursue such a course, but on the contrary submitted proposals for bids, accepted the lowest responsible bid in view of the alleged objectionable provisions, and entered into contracts for the construction of portions of the work, and admits that, unless restrained, it will enter into additional contracts on the same terms and conditions. It is enough to determine whether the city could lawfully do what it undertook and threatens to do without also deciding what it might otherwise lawfully do but which it has not undertaken nor threatened to do.

Still, it may not be inappropriate to observe that, in view of prior decisions of this court, it is not at all clear that the city lawfully could enter upon the construction of such a contemplated public improvement as here, amounting to $600,000, without making estimates of the cost thereof and submitting proposals for bids and letting contracts for the construction of it. *Bonneville Irrigation District* v. *Ririe,* 57 Utah, 306, 195 P. 204, 205. It there was stated that:

"It may be said to be the general policy of the law of this state that no contract shall be awarded by any municipality or public corporation for any public improvements except to the lowest responsible bidder after publication. Comp. Laws Utah 1917, § 819, as amended by chapter 14, Laws Utah 1919; *Utah Savings & Tr. Co.* v. *Salt Lake City et al.,* 44 Utah 150, 138 P. 1165."

It is claimed such statement was not necessary to the decision, and therefore is of no binding effect. The statement as to the declared policy of the state was germane and relevant. Considering the general scope and purpose of our laws on the subject, it may not well be disputed that such is the general policy of the state. Nor may it successfully be contended that such is not a wise or wholesome policy. As is seen, the court cited section 819 as amended by Laws Utah 1919, c. 14, as supporting such declared policy. The

effect of what is now claimed is that the citation does not support the proposition for which it was cited. This court thought it did and for that purpose cited it.

In such respect it further is urged that the Bonneville Case was overruled by the later case of *Barnes* v. *Lehi City et al.*, 75 Utah 321, 279 P. 878. It is not claimed it was expressly or directly overruled or that any reference was even made to it. What is claimed is that the two decisions are in conflict, and hence, by implication the former is overruled by the latter. But that does not follow. In the Barnes Case, the city, owning and operating a municipal electric light and power plant to furnish and supply its inhabitants with electric light and electric heating entered into a contract with Fairbanks, Morse & Co. to purchase a new 180 horse power "Diesel engine generating unit" at the purchase price of $42,000 to be paid for in installments "out of proceeds derived from the improvements" and not out of the general fund of the city nor out of funds or revenues derived from taxation. The purchasing of the engine generating unit was a mere equipment similar to purchasing motor engines and equipment for departments of a city and was to be paid for out of proceeds derived from operating the business. For such reasons and upon such facts it was held the city was not, under section 819, as amended by Laws Utah 1919, c. 14, required to advertise for bids before entering into a contract for such a purchase. And then for aught made to appear the Diesal engine required was purchasable only from the manufacturer or his dealers. As readily is perceived, the facts of the two cases are dissimilar. It is familiar doctrine that every opinion or decision is dependent upon the facts upon which it is founded and must be considered in view of them and may not without reference to them be indiscriminately applied to cases of dissimilar facts. That also is true as to the case in hand. The facts in the Barnes Case and in this case are markedly dissimilar. Hence it does not follow, because this court in the Barnes Case held that the contract under the facts there disclosed could lawfully

be entered into without advertising and submitting proposals for bids, that the city in constructing a public improvement amounting to $600,000 could lawfully enter into contracts without advertising or submitting proposals for bids, or that it lawfully could construct the works without letting contracts. The case here is not one of purchasing mere equipment, but involves the construction of a municipal public improvement with proceeds from a bond issue of $600,000 voted for such purpose and to be paid for interest and principal by assessments and levy of taxes on all taxable property of the city, from which no one having such taxable property may escape.

The expressed policy in the Bonneville Case is but in harmony with the general doctrine that proposals for bids for certain municipal contracts to be let to the lowest responsible bidder are for the purpose of inviting competition, to guard against favoritism, improvidence, extravagance, and fraud in awarding contracts, and for the benefit of taxpayers to secure the best work and supplies at the lowest price practicable. 3 McQuillin Municipal Corporations, (2d Ed.) § 1286. For such purpose may it be assumed the city here submitted proposals for bids and let contracts to the lowest responsible bidder and thus pursued the policy declared in the Bonneville Case. It did not do nor it is alleged or claimed that it intends to do otherwise. Since the city chose to pursue such course, as it had the right to do, and if, in soliciting bids and in entering into contracts, it imposed conditions which hindered or prevented obtaining the lowest practical bid from responsible bidders, it thereby frustrated the very purpose and object sought by it in soliciting bids and pursuing the course pursued by it and which it now asserts, unless restrained, will be pursued by it. It is that which by this proceeding is sought to be prevented.

It, however, is chiefly urged that the city was authorized and justified in imposing and requiring performance of the provisions complained of on the theory of police power. To

support that, the city points to Comp. Laws Utah 1917, § 570x2, which in substance provides that, among the powers conferred upon the board of commissioners, it is given power "to appropriate money for corporate purposes only"; to provide for payment of debts and expenses of the corporation; to purchase, sell, lease, and convey real and personal property for the benefit of the city; to improve and protect such property and to do all other things in relation thereto as natural persons; "provided, that it shall be deemed a corporate purpose to appropriate money for any purpose which, in the judgment of the board of commissioners or city council, will provide for the safety, preserve the health, promote the prosperity, and improve the morals, peace, order, comfort, and convenience of the inhabitants of such City." Confessedly, the money derived from the sale of the bonds for the particular purpose for which the bonds were issued and negotiated constitute a special fund which cannot be transferred or applied to the general fund of the city, or for the payment of general debts or expenses of the municipal corporation or for any purpose or object for which the fund was not directly created. Such, too, is the law. 6 McQuillin Municipal Corporations, (2d Ed.) § 2462. I do not understand any one contends that the city, in the legitimate exercise of the police power, may directly or indirectly devote, transfer, or apply moneys or proceeds of a special fund to any matter or thing other than or different from the particular purpose for which the special fund was created. Hence, one of the questions which divides us is, Has the city done or does it threaten to do that; that is, does the effect of what it has done or threatens to do, by imposing the provisions complained of and requiring them to be carried out, constitute directly or indirectly a diversion of a substantial portion of the special fund from the particular purpose for which it was created and intrusted to the board of city commissioners, or constitute an application thereof to some purpose other than that for which the fund was created, or an expenditure of the fund not in a reasonable,

practical, and economical manner, or, still worse, to a waste of a substantial portion of it?

In this connection there is another well-recognized principal of law that taxes may not be levied in favor of enterprises or objects which are essentially private; that mere incidental benefits to the public or to the state or to any of its municipalities does not constitute a public purpose in a legal sense; and that private enterprises and objects cannot be aided by taxation without unsettling fundamental rights in private property. I Dillon Municipal Corporations (5th Ed.) § 319. All that is well illustrated by the case of *Lowell et al.* v. *City of Boston,* 111 Mass. 454, 15 Am. Rep. 39. There, by an express act of the Legislature, the city of Boston was authorized to issue bonds and loan the proceeds on mortgages to owners of land the buildings on which were burned or destroyed by the great fire of 1872. The act was held unconstitutional and the city restrained from issuing the bonds. It there, as here, was claimed that an emergency existed, and that it was within the power of the Legislature to authorize the city, in aid of those in distress and rendered homeless, to re-establish warehouses, shops, manufactories, and stores, and by means of such facilities to enlarge or revive trade and business, which, it was claimed, would result in public good and general welfare. The court answered the contention by saying that such were considerations of mere private interests, and, though expressly declared to be the aim and purpose of the act, yet would not constitute a public object or benefit in a legal sense. Further, said the court:·

"The promotion of the interests of individuals, either in respect of property or business, although it may result incidentally in the advancement of the public welfare, is, in its essential character, a private and not a public object. However certain and great the resulting good to the general public, it does not, by reason of its comparative importance, cease to be incidental. The incidental advantage to the public, or to the State, which results from the promotion of private interests, and the prosperity of private enterprises or business, does not justify their aid by the use of public money raised by taxation,

or for which taxation may become necessary. It is the essential character of the direct object of the expenditure which must determine its validity, as justifying a tax, and not the magnitude of the interests to be affected, nor the degree to which the general advantage of the community, and thus the public welfare, may be ultimately benefited by their promotion. The principle of this distinction is fundamental. It underlies all government that is based upon reason rather than upon force."

The principle is also well discussed and upheld by Mr. Justice Brewer in the case of *State* v. *Township of Osawkee,* 14 Kan. 418, 19 Am. Rep. 99. The Lowell Case, in the case of *Citizens' Savings & Loan Association* v. *Topeka City,* 20 Wall. 655, 22 L. Ed. 455, where the same principal of law was involved, is cited and approved; and Rose's Notes on U. S. Reports, Rev. Ed. Supp. vol. 1, page 1242, and Rev. Ed. Complete Citations, vol. 8, page 572, show numerous cases where the Topeka City Case was approved and followed to the effect that the "taxing power must be exercised only for public purpose and not to aid private enterprise which may benefit the public collaterally." Such principles are here applicable, not in the sense that the bonds are in themselves invalid, for they were duly authorized to construct the municipal improvement, and, as has been seen, were issued and negotiated stripped of the objectionable features complained of, but in the sense that the city, by imposing and requiring the performance of the complained of provisions in contracts let and to be let for the construction of the improvements, applied and will apply a substantial portion of the proceeds of the bonds to an object and a purpose which is not the essential character of the direct object of the expenditure, but, in a claimed advancement of public welfare, to a purpose admittedly to promote private interests of individuals out of employment, and by such provisions requiring the employment of a larger number of men than is necessary to construct the improvements, which essentially constitutes an application of a substantial portion of such proceeds to a private and not to a public object, and hence equally objec-

tionable as though the submission and issue of the bonds had been directly based on such object and purpose.

Let it be conceded that it is within the power of the state in virtue of the police power by legislative enactments to provide and care for the dependent poor and the indigent, and for that purpose to provide funds by taxation or by appropriations. Let it also be conceded that the state may authorize and empower counties or other municipal governments to do so. Such power by this state is conferred on counties. Comp. Laws Utah 1917, § 1400x40. The power is broad and comprehensive. Not only is such power conferred, but also a duty is imposed upon the county to care for, maintain, and give relief to the sick, the dependent, poor, and the indigent, to provide hospitals, poorhouses, and such other institutions as may be necessary for such purpose, and to levy all necessary taxes therefor. No such power is conferred or duty imposed on cities or towns of the state. In jurisdictions where such a power is or has been permitted to be exercised by cities and towns, it will be found such power was expressly conferred upon them. It is not claimed that such a power is expressly conferred upon cities or towns of this state. It is urged by some counsel in the cause that the city could do so by reason of the general welfare clause of section 570x2, supra. The city itself makes no such contention or that it is authorized by taxation to create a fund for such purpose. Though it be assumed, which is not even contended for by the city, that, because of such general welfare clause, the city would be authorized or justified in its discretion to make appropriations out of its general fund for such purpose, yet no one should so far be carried away by emotions or sentiment as to urge that the city would be authorized or justified in making such appropriations directly or indirectly out of a special fund not created for such a purpose.

The point more particularly stressed and emphasized by the city is that in letting contracts for the construction of public improvements a large discretion is given the board

of commissioners as to the terms and conditions under which contracts are to be let; that though the city was required to submit bids, as was done, it, nevertheless, was not required to do as it did do, accept the bid of the lowest responsible bidder; that the lowest bid, though by a responsible bidder, is not always the best bid; and that the quality and grade of the material and the workmanship of the improvement is not to be measured by the cheapness at which the improvement may be constructed, etc. Let all that, at least most of it, be conceded. But it here is beside the question, for, it in substance is alleged and openly and frankly admitted by the city that the complained of provisions were embodied and will be embodied in proposals for bids and in contracts let and to be let, for the purpose of giving employment to a greater number of workmen than otherwise would be required without embodying such provisions, and that by so doing the project will cost $55,000 more money than it would cost if such provisions were not imposed. No claim is made that by imposing such or any of the provisions better or more competent workmen or labor, in the judgment of the board, may be had, or that the work may better be done or that better results or greater efficiency accomplished. All in such respect claimed is that with the provisions imposed the same grade and quality of work may be had and the same results as to efficiency accomplished as could be done without such provisions, but at an increased cost of $55,000 of the taxpayers' moneys.

The city by its brief seemingly justifies such increased cost by a stated analogy that if the city, when a storm occurs, undertook to remove the snow and clear the streets by workmen with "broom and shovel" instead of the use of snowplows, tractors, machine street sweepers, or other appliances and equipment, and though such method be pursued to give employment to a larger number of men than was required to do the work, and though it materially increased the cost of doing it, yet no complaint could legally be lodged against such manner of clearing the streets, because, as is

claimed, the manner of doing it was within the discretion of the commission. Why not carry the analogy one step further by the city also requiring the snow to be carried away in wheelbarrows and dumped at some accessible place on the outskirts of the city and thereby give employment to a still larger number of men and at a still further increased cost of doing the work? Should it be said the suggestion would be an unreasonable manner of doing the work and render the doing of it uneconomical, or in a wasteful manner, then may the same thing be said as to the asserted analogy, and so may the same thing be said, only perhaps in a lesser degree, to the prosecution of the work in question under the complained of objectionable provisions embodied in the proposals for bids and in the contracts. The stated analogy by the city, however, is inapt, for we are here dealing with a special fund created for a particular purpose and which is to be devoted to the expenditure of such direct and not for some collateral purpose or object. Had the city, in submitting the proposition of bonding the city to raise money by taxation for the construction of the contemplated improvement, embodied in the submission the alleged objectionable features and provisions complained of for the stated purpose to give employment to a larger number of men than admittedly was necessary to properly construct the improvement at an econmical and practical cost, but at an increased and unnecessary cost of $55,000, it may not be assumed the bonds would have been voted for.

When, therefore, the city openly and frankly admits that by imposing the complained of provisions more men will be required to do the work than otherwise would be required, and that the provisions were embodied in the proposals for bids and in contracts let and to be let for such very purpose, and thereby unnecessarily increased the cost of the proper construction of the project to the extent of $55,000, the right of taxpapers to complain and demand that the city desist from such a course is undoubted. That may not be denied by the assertion that the board of commissioners had

a discretion in determining the cost of the construction. That is not the crux of the situation. When the question as to the reasonable or practical or economical cost of doing or letting the construction of a public improvement is involved, let it be conceded a wide latitude is given and ought to be given to the judgment of the board in the exercise of a wise and sound discretion for the benefit of the taxpayers and of the general public. Here the city in effect concedes and openly admits that, by the conditions imposed and under which the improvements are to be constructed, the construction will not be at a reasonable or practical cost, or at which the improvements without such conditions could properly be constructed; that the conditions are and will be imposed for the very purpose of employing more men than are necessary to contsruct the improvements, and that by so doing the construction will cost $55,000 more money than is necessary to properly construct them, and that all that admittedly is done not for the benefit of the taxpayers, but to promote private interests of a particular class in need of aid and support. Just as harmful would it be and just as much right would taxpayers have to complain if the city, on the assumption that it was not required to submit proposals for bids or let contracts to do the work, and that it itself could do it without bids or letting contracts, and to promote private interests of a particular class, undertook to do the work under the conditions stated in the complained of provisions and admittedly did and proposed to do the work in such manner for the avowed purpose of giving employment to more men than are necessary or required to properly construct the improvement and thereby unnecessarily and admittedly increase the cost in a substantial and material amount. Of course the city, under Compiled Laws Utah 1917, § 570x37, had power to construct the contemplated improvement and to regulate the construction and use of it. But let it not be overlooked or minimized that, to bond the city to raise money by taxation for such purpose, consent of the taxpayers was requisite; and that the proceeds derived

from the sale of the bonds constituted a special fund to be devoted to the particular and direct purpose for which such consent was given. The board of commissioners was in duty bound to so expend and apply such fund. It had no discretion to do otherwise. By the statute referred to and certainly not the consent of the taxpayers was the board permitted in its discretion directly or indirectly to apply any part of such fund for any collateral or ulterior purpose, nor does the statute give the board any discretion to prosecute the construction of the improvement on a basis other than at a reasonable, economical, and practical cost, nor in such manner as to give employment to many more men than are required to properly do the work and thereby unnecessarily and admittedly to increase the cost thereof in a substantial and material amount.

Thus, when the city admits that it is not prosecuting the work at a reasonable and practical cost—asserts that it is not required to do so—admits that for a collateral and ulterior purpose, and to promote private interests of a particular class, it is so prosecuting the work as unnecessarily to require the employment of a great many more men than are necessary and at a substantial and unnecessary cost to the taxpayers, and imposed conditions requiring 90,000 eight-hour day shifts for common labor to complete the construction of the improvement, when without such conditions the construction could be completed with one-third such number of shifts, if, under such circumstance taxpayers may not legally complain, it is difficult to perceive under what circumstance they may do so; and still more difficult to perceive how to so prosecute the work was within the discretion of the board of commissioners and was not a clear violation of the trust imposed upon it in handling and expending moneys of the taxpayers.

Hence the numerous cases cited by the city to the effect that courts may not interfere with the discretion of municipal bodies in the expenditure of public funds or in the construction of public improvements have here no application,

for they do not teach that in expending public funds the municipality may without restraint commit waste, or for some collateral purpose and to promote private interests of a particular class may directly or indirectly devote or use a special fund or a substantial portion thereof for a purpose or object for which the fund was not created, or that a municipality without restraint may prosecute the construction of a public improvement in such manner, as the city here in effect admits, is not at a reasonable, economical, or practical cost, but at a materially increased cost in order to give employment to more men than are necessary to properly construct the improvement. The cited cases do not teach any such doctrine as that.

Nor may the course pursued by the city be defended upon the further claim made by it that the money's paid and to be paid because of the increased cost of the construction of the improvements will nevertheless be applied to and go in the construction of the improvements for which the special fund was created. If that be true, then would it also be true if the city, to give employment to a still greater number of men, required not only all excavating, loading, and back filling to be done by hand labor, but also all other labor of every kind and character to be done exclusively by hand work without the aid or use of machinery, tractors, or equipment of any kind.

Should it again be said such a requirement would be unreasonable, it would be so because incurring unnecessary costs and expenses in making the improvements, committing waste of a substantial portion of the special fund and applying it to a purpose or object not contemplated by its creation, which reasons equally apply, only in a lesser degree, to the situation in hand by imposing the complained of provisions and requiring them to be carried out to give employment to more men than are necessary to do the work. As well may it be said the city itself could levy taxes to make direct appropriations to aid and support the unemployed which no one contends the city may do. Should it be said, as

in substance is urged by the city, that in the one instance, giving employment to more men than necessary or required to do the work to give aid to and support the unemployed, the moneys paid to such workmen nevertheless are applied to the construction of the improvement, and that, in the other instance, moneys appropriated and donated to the unemployed would not; such attempted distinction in substance is no real distinction, for, what the city may not do directly, it cannot do indirectly; and moneys so paid and expended would not in fact be paid for the construction of the works, but in reality and primarily as charity to aid those to whom paid.

There are so-called "cracker-barrel philosophers" who, by their pseudo-philosophies, contend that the more difficult it is made to do a thing the better it is for those who have to sell labor, denounce the machine age and mass production, insist that modern labor saving machinery diminish employment and enslave the many to make captains of a few, and to a large extent the use of them should be restricted or prevented, that mankind would be better off by causing work to be less productive and by requiring additional labor to accomplish the same thing, or by getting as little done as possible by as much labor as possible, all of which Proffessor Taussig in his treatise on "Principles of Economics," vol. 2, p. 194, has shown to be spurious, "and that if all men did that, all would be worse off." To such effect are also other well-recognized authorities on economics.

It is further to be observed that one of the provisions embodied in the proposals for bids and contracts let and to be let for the construction of the work requires the contractor to employ all workmen therefor through the agency appointed, controlled, and directed by the board of commissioners. While the contractor is permitted to select workmen furnished and supplied by such agency under rules and regulations promulgated by it and approved by the board of commissioners, yet otherwise he is given no choice in the selection of his workmen, and thereby a substantial limita-

tion and restriction is put upon competition and opportunity in obtaining labor, as well as to the character and quality of it, except as the contractor may be able to select it through those good, bad, and indifferent furnished and supplied by the agency. By his contract, the contractor is held to a strict compliance with the plans and specifications prepared and submitted by the city and to a full completion of the work to its satisfaction, and is in every way held liable and responsible for the manner in which the work is done by his workmen, yet, to a substantial degree, is limited and restricted in the selection and hiring of his workmen. By the contract he even is not given the right, for cause or otherwise, to discharge any of his workmen, except as may result from a rotation of them as by the contract and rules and regulations of the agency provided. That such a provision materially affects competitive bidding and tends to influence the conclusion to be reached by a responsible bidder as to the amount or price for which he, in view of such restriction, may be willing to undertake the construction of the work, may not well be doubted. It is conceivable, because of such and of other complained of provisions, that some responsible bidders would even decline to bid or enter into contracts to do the work under such conditions and restrictions imposed and required. If competition with respect to any material element by proposals for bids and by contract be limited or restricted, the very purpose of submitting proposals for bids to obtain contracts to do the work at a reasonable and practical cost, is to that extent impaired, if not destroyed. *Frame* v. *Felix*, 167 Pa. 47, 31 A. 375, 27 L. R. A. 802; *Street* v. *Varney Electrical Sup. Co.*, 160 Ind. 338, 66 N. E. 895, 61 L. R. A. 154, 98 Am. St. Rep. 325; *Fiske* v. *People*, 188 Ill. 206, 58 N. E. 985, 52 L. R. A. 291; *Wright* v. *Hoctor*, 95 Neb. 342, 145 N. W. 704, 146 N. W. 997, 52 L. R. A. (N. S.) 728, Ann. Cas. 1915D, 967.

Now, as to the provision requiring the contractor to pay a minimum wage of $3.50 per day for all labor. Admittedly the authorities are in conflict as to the validity of statutes

and ordinances fixing a minimum wage. Notes, Ann. Cas. 1913E, 990; notes 51 L. R. A. (N. S.) 686. Let it be assumed that by the weight of judicial authority it is competent for the state, in the absence of express or implied constitutional restrictions, to fix a minimum wage for labor on all public work or improvements, or may authorize municipalities to do so. But that here does not solve the problem. We have a constitutional provision (article 16, § 6) which provides that eight hours shall constitute a day's work on all works and undertakings carried on or aided by the state, county, or municipal governments. We have a statute (Comp. Laws Utah 1917, § 3666) to the same effect. That is not here involved and no complaint made of it. We, however, have no constitutional provision, nor any statute, nor have we been referred to any ordinance of the city, fixing a minimum wage for workmen or laborers whether employed on public works or otherwise. We had a minimum wage scale for females (section 3671), but that was repealed by Laws Utah 1929, c. 9, page 12. In some jurisdictions, by legislative enactments or by charters granted, authority is conferred upon municipalities to fix a minimum wage for workmen and laborers employed in the construction of public works. We have no such legislative enactments, nor does the city contend that there is any such. It merely asserts that under its general police powers it in such respect may do all that the state might do. But no such power is conferred upon the city. It may not be exercised under the general welfare clause of section 570x2, supra, for that relates merely to the power "to appropriate money for corporate purposes," nor under other mere general welfare clauses. Such clauses must be considered and applied in connection with the subject to which they relate and of which they are a part. To disconnect them from context and independently thereof consider them as giving the municipality power to do whatever it reasonably may will to do is but to say that under such general welfare clauses all the police power possessed by the state has been conferred on municipalities. The con-

trary has been declared many times. So to authorize the city in the legitimate exercise of police power, without even promulgating an ordinance on the subject to fix a minimum wage in contracts let and to be let by it for the construction of public works, requires express authority therefor. Since the police power, as we all know, is an attribute of soverignty and is inherent in and belongs to the state, and that the power may be exercised by a municipality or other governmental body or board only as the power may have been expressly delegated thereto by the state, it is groundless to assert that the city in the legitimate exercise of a claimed police power may do what the state might do, and to do so is violative of the well-recognized and established rule in this and in many other jurisdictions that the powers of the city in such respect are strictly limited to those expressly granted and necessarily implied by those so granted. Here let the matter not be confused by the citation of numerous authorities where statutes fixing a minimum wage have been upheld, and ordinances where, by legislative enactments or by charters, the municipality was authorized to promulgate such an ordinance. In a few jurisdictions authority is given municipalities to exercise all acts of police power not prohibited by the Legislature. Cases from such jurisdictions are also cited upholding ordinances promulgated on the subject. But the rule here is, and many times declared by us, that the powers of the city are strictly limited to those expressly granted and necessarily implied by those so granted. Confessedly, we here have no statute nor any ordinance on the subject of minimum wage. Hence, cases cited upholding statutes and ordinances on the subject are wholly inapplicable. If the power so exercised by the city was unauthorized, as it is, it is no answer in defense thereto to assert, as does the city in part, that the minimum wage so imposed was the current wage usually paid by contractors for such and similar work, for that, imposing a minimum wage in proposals for bids and in contracts let and to be let has a direct tendency to influence competitive bidding and impair

the very purpose of submitting proposals—the policy here pursued and threatened to be pursued by the city—to obtain contracts on terms at the most reasonable, economical, and practical cost and to the advantage of the taxpayers in having the work economically done. But, aside from that, it is here averred and admitted that, had not the provision of minimum wage been so imposed, common labor could have been obtained at $3 a day.

If, as to this provision as well as to other complained of provisions imposed in proposals for bids and in contracts let and to be let, it be said, as it is, that the board of commissioners by imposing them acted in good faith to benefit and aid a particular class, yet, must it also be noticed and not minimized nor lightly pushed aside that the primary and more important duty imposed on the board and the city in spending the taxpayers' moneys intrusted to them for a special and particular purpose was to so expend the fund as best to accomplish an efficient and proper construction of the improvement at an economical, reasonable, and practical cost and for the benefit of the taxpayers and of the general public. The board was required to be as solicitous to promote and safeguard the interests of the general public and of the taxpayers as to promote interests of and give aid and benefit to a particular class.

Let it be assumed that, everything being equal as to quality and cost, it was competent for the city to require all material to be used in the construction of the works to be purchased from materials and products manufactured or produced in the state. *Murphy* v. *Salt Lake City,* 65 Utah 295, 236 P. 680, lends some support to such view. But a more serious question is that relating to the preference required to be given laborers and employees of all kinds, skilled and unskilled. We have a statute (Comp. Laws Utah, 1917, § 4865), which provides that in employing workmen in or on the construction of public works by the state, county, or municipality, whether by contract or otherwise, "preference shall be given citizens of the United States, or those having

declared their intention of becoming citizens," and that such provision shall be inserted in contracts for the construction of such works, and, if not complied with, the contract shall be void. The evident purpose of such a statute is to give preference to such citizens as against aliens. Statutes of like kind have been held constitutional. *People* v. *Crane,* 214 N. Y. 154, 108 N. E. 427, L. R. A. 1916D, 550, Ann. Cas. 1915B, 1254; *Crane* v. *New York,* 239 U. S. 195, 36 S. Ct. 85, 60 L. Ed. 218; *Heim* v. *McCall,* 239 U. S. 175, 36 S. Ct. 78, 60 L. Ed. 206, Ann. Cas. 1917B, 287. Let it be assumed and as there held that it was competent for the state to declare such a policy without offending constitutional provisions; but that does not here help the situation. No claim is made involving the validity or application of the statute on the subject. The point here is this: Since the Legislature itself has declared what preference in constructing public works may be given to laborers—to citizens of the United States or to those having declared their intention of becoming citizens—may the city enlarge or restrict such legislative enactment and policy not sanctioned by nor embraced within the act? In other words, may the city in such respect do more than what the state has done and declared? The condition in such respect imposed by the city is that "preference shall be given to the citizens of the United States or those having declared their intention of becoming citizens and particularly to bona fide residents and heads of families in" Salt Lake City; and as is alleged and admitted the city thereunder has promulgated a rule and regulation requiring the employment of all labor, not only from those furnished and supplied by the agency, but also only those who have been bona fide residents of the city for at least one year and heads of a family. However laudable or commendable the desire under existing conditions to so restrict the employment of labor, we look in vain for any such legislative sanction. It certainly is not given by the statute referred to on the subject. The city may not nor may we enlarge and expand or restrict the statute to suit emergen-

cies or conditions or particular cases not embraced within the statute, and successfully escape the charge of judicial legislation. Contracts restricting the employment of labor in constructing public improvements to citizens and residents of the city in which the work is to be constructed have been held invalid. *Diver* v. *Savings Bank,* 126 Iowa, 691, 102 N. W. 542, 3 Ann. Cas. 669. While the contract was there held invalid, yet by reason thereof no relief was granted, because no complaint was made until after the work was done and benefits received of the contract and because it affirmatively was made to appear that the manner in which the labor was employed did not increase the cost price of the work. Here complaint made is timely, and here it is alleged and admitted that each and all of the provisions imposed did and will materially increase the cost of the construction of the improvements, and, had "any of them been eliminated," bids substantially less in amount would have been and will be received for such construction. In such particular as well as in all considerations of fact in the case it must be borne in mind that the case, on the demurrer to the petition for the writ, by stipulation of the parties, is presented and submitted for decision on the merits without leave of further pleadings or proceedings in the cause.

A further point is made by the city that in the construction of the improvements it exercised a proprietary power or function as distinguished from a governmental one, and for such reason it is contended the manner in which such power is exercised is not of judicial inquiry except on the ground of fraud. We need not now consider the variant and conflicting views of courts as to when a power exercised or an act performed by a municipality is a proprietary or a governmental power, or as to whether the construction of the improvements in question is the exercise of the one or of the other power, for the reason that on the alleged and admitted facts of the case it is of little moment whether the construction be regarded as the exercise of the one or of the other power. When the city deals with proceeds of a special

fund raised by taxation for a particular purpose to construct a public improvement, it may not, whether exercising a proprietary or governmental function in the construction thereof, waste a substantial portion of such fund, or directly or indirectly divert or apply it to some collateral purpose, or to promote or aid private interests of a particular class so prosecute the work as under the conditions stated and imposed, for the purpose of giving and requiring the employment of many more men than are necessary to properly construct the improvements and thereby admittedly increase the cost of the construction $55,000. The wrong lies in doing that, whether done in the name or under the claim of a proprietary or of a governmental power, and may not be defended under either claim. *Richards v. City of Portland*, 121 Or. 340, 255 P. 326, and cases there cited.

Lastly, at the oral argument of the cause it was admitted by the city that the well-recognized text-writers and authors, McQuillin and Dillon on Municipal Corporations, either are against or do not support the contentions of the city, at least in most particulars, and that it was unable to find any judicial authority directly in point either in favor or against the authority of the city to impose all of the material conditions imposed by it. It, however, referred to and cited numerous cases which it claimed in principle and by analogy support all of its contentions. But on the alleged and admitted facts of the case in hand I think such cases are readily distinguishable and therefore inapplicable.

Thus, when the city in soliciting bids and letting contracts for the construction of the improvements by imposing conditions for collateral purposes and which materially enhanced the practical and economical cost of a proper and an efficient construction of the improvements and as by the plans and specifications provided by the city, it, for reasons heretofore stated, undertook to do what it had no lawful right to do. Laudable and proper enough it is for the city, because of unemployment conditions, to now construct the needed improvements, yet in the construction of them, to

meet an emergency which has not a thing to do with, nor in any way related to, the construction or use of the improvements themselves, nor even with the necessity of them, the city may not transcend its powers and do what admittedly it could not legitimately do without such emergency. To assert the contrary and so to establish a precedent whereby the city is permitted to construct public improvements not at a practical and an economical cost, but in such manner as to render the performance of the work more difficult and so as to require the employment of much more additional labor than necessary to accomplish the same thing and thereby materially increase the cost of the construction, may not, in the language of Dillon, supra, "be contemplated without deep anxiety."

As prohibition is a preventive and not a corrective remedy, it is doubtful whether prohibition may undo what already has been done or affect costs and expenses with respect thereto which have already been incurred. But the performance of the contracts let containing the provisions complained of (except as to the purchase of materials and products manufactured and produced in the state) ; and which, or portions of which, have not yet been performed, and entering into contracts threatened to be let with the objectionable features, should be restrained on the ground that such contracts with such provisions are against public policy, and are unauthorized and invalid. I therefore concur in the granting of the writ.

ELIAS HANSEN, J. (concurring).

I too concur in the order granting the writ prayed for. The cases which are cited and relied upon by the defendants do not, as I read them, justify the conclusion that all of the questioned provisions of the proposed contract here under review are entitled to receive judicial sanction. Each of the cited cases support, or tend to support, one or more of the following legal propositions: That it is competent for the

lawmaking power to enact laws providing for the manner in which public improvements shall be constructed, as to the number of hours that shall constitute a day's labor, as to the minimum wage that shall be paid, and as to prohibiting the employment of aliens. The lawmaking body of a municipality may, according to the cases cited by the defendants, exercise the same powers with respect to the enactment of ordinances affecting municipal improvements as the Legislature may exercise over public improvements generally when the municipality is so authorized by constitutional provisions or by legislative enactment. None of the cases cited by the defendants deal with the question of authority of a city to place in a contract for the construction of a public improvement provisions such as are here involved in the absence of either a general law or a city ordinance authorizing the same. No case has been cited and we have been unable to find a case where either Congress, a state Legislature, or a city council or commission has attempted to replace the use of machinery by hand labor. Laws fixing minimum wages and maximum hours of labor in the construction of public improvements and excluding aliens from working thereon are not new, but a requirement that labor-saving machinery be dispensed with is a departure from the trend of modern civilization. Probably nothing has contributed more to the advancement of our present civilization during the past century than has the construction and use of labor-saving machinery. In the light of such fact it is difficult to perceive of any legal or economic principle that can be advanced in support of a requirement that a contractor may not use labor-saving machinery in the construction of a public improvement.

Independent of any provision in the proposed contract here involved, a contractor may not require workmen to work more than eight hours per day on the construction of the proposed sewer. Constitution of Utah, art. 16, § 6; Comp. Laws Utah 1917, § 3666. And, likewise, the contractor may employ only citizens of the United States and persons who

have declared their intention of becoming such. Comp. Laws Utah 1917, § 4865.

An entirely different question is presented when we come to consider the other material questioned provisions of the proposed contract. As to the authority of the city council to include such provisions the Legislature has not spoken. So far as appears there is not now, and there never has been, an ordinance of Salt Lake City fixing a minimum wage that must be paid by a contractor who constructs an improvement for the city. Nor is any claim made that the city ever had an ordinance requiring that hand labor be employed, when possible, by a contractor who undertakes to construct an improvement for the city. As stated in the prevailing opinion, this court is committed to the doctrine that a municipality has only such powers as are expressly conferred upon it by an act of the Legislature, and such powers as are necessary to the exercise of the powers expressly conferred. In the absence of express authority I can see no escape from the conclusion that the city is without authority to fix a minimum wage that must be paid by a contractor who engages in constructing an improvement for the city, and, likewise, there is no authority for requiring that a contractor shall, when possible, use hand labor in constructing such improvement. Nor can it be successfully maintained that the authority to let a contract for the construction of a municipal improvement carries with it the implied authority to fix the minimum wage that the contractor shall pay to his employees, or that the work shall, when possible, be performed by hand labor. Such provisions in a contract between a city and a contractor are in no sense necessary, nor' do they aid in the construction of the improvement contracted for.

If a city is without authority to enact an ordinance fixing a wage which a contractor must pay to his employees, and requiring that the work contracted for be performed, when possible, by hand labor, it follows that a city is without authority to accomplish these ends by inserting such provisions in its proposed contracts. If there be any choice

between the two methods, the former is less objectionable than is the latter. If, at the time the bond election was called, Salt Lake City had had an ordinance fixing the minimum wage that contractors must pay to their employees in constructing public improvements and requiring that contractors construct public improvements, when possible, by hand labor, the taxpayers of Salt Lake City would have been advised as to the use to which the money derived from the sale of the bonds would be put. In the absence of such an ordinance or some notice to that effect, the taxpayers had a right when voting to assume, and they now have a right to demand, that the contemplated improvement be constructed according to some approved method.

It is earnestly urged on behalf of the defendants that, the Legislature having granted to the city the power to construct a sewer and having failed to prescribe the manner in which the same shall be constructed, the city commissioners are at liberty to construct the sewer as they see fit so long as their conduct is not tainted by fraud or bad faith. In my opinion, the power granted to the city commission is not as broad as claimed. Statements may be found in some cases to the effect that courts will not interfere with the action of a city council or a city commission while acting within the scope of their authority, in the absence of proof of fraud or bad faith. Other courts hold that actions of a city council or a city commission will not be upheld unless they are exercised in a reasonable manner. The latter is, as I think, the proper test. If it be sought to hold the members of a city council or a city commission personally liable for acts performed within the scope of their duties, it is quite generally held that fraud or bad faith must be shown. When, however, the members of a city council or city commission are engaged in passing an ordinance which is legislative in character, they are entitled to the same privileges and prerogatives as members of the state Legislature, and their motives are not even open to judicial inquiry. McQuillin Municipal Ordinances, §§ 161-162, pp. 256-259. It is quite generally,

if not uniformly, held that a city ordinance will not be upheld unless the express power conferred upon a municipality is reasonably exercised. In the language of 2 McQuillin Municipal Corporations, § 726, p. 1578, it is said that:

"Where the mode of the exercise of a power expressly granted is not prescribed, courts will assume to determine whether the provisions of the ordinance respecting the mode adopted is reasonable, for in no event will an arbitrary and unreasonable exercise of the power conferred be upheld by the judiciary."

It would seem upon principle that the provisions of a contract for the expenditure of a special fund for a designated improvement should be subject to the same test of reasonableness, or the lack thereof, as are the provisions of a city ordinance. Many cases so hold, among them the case cited by the defendants of *City of Chester* v. *Kennedy,* 344 Ill. 224, 176 N. E. 430. The motives which prompt the members of a city council or city commission to vote for the passage of a city ordinance or for the entering into of a contract in behalf of the city cease when the ordinance is passed or the contract is executed, but the provisions of an ordinance and likewise of an executed contract live on to affect the weal or the woe of the public or some part thereof. The public is more vitally concerned with what is done than with why it was done.

If, however, we may inquire into the motives which prompted the members of the city commission to place the objectionable provisions in the proposed contract, such inquiry is bound to lead to confusion unless we keep in mind the fact that the funds derived from the sale of the sewer bonds may not lawfully be used for any purpose other than the proposed improvement. Motives which prompt the use of the bond money here in question, or any part thereof, to a purpose other than the construction of the sewer are not entitled to judicial sanction because the mandate of our State Constitution, article 14, § 5, directs for what purpose such money, and the whole thereof, shall be expended.

The laws of this state prescribe ways in which a municipality may construct municipal improvements. They may be constructed by the letting of a contract, or they may, in some instances, be constructed under the direction of the proper officers of the municipality. When the estimated cost of a contemplated improvement payable out of the general funds of a city such as Salt Lake exceeds the sum of $6,000, the city shall call for bids for making the same. If, after twice advertising for bids, no satisfactory bid less than the estimated cost of the proposed improvement shall be received, the board of commissioners may proceed to make the improvement under its own direction. Laws of Utah 1919, c. 14, p. 23. In case an improvement is to be paid for by a special tax or assessment, the city is required to let a contract for the construction thereof to the lowest responsible bidder. Laws of Utah 1921, c. 15, p. 59. The Legislature has failed to make provision for the manner in which a public improvement such as the one here involved shall be constructed. Because of that fact it is urged that the defendants may choose any manner of constructing the proposed storm sewer that they see fit so long as their actions in such respect are not capricious, arbitrary, or tainted with bad faith. The city may in my opinion without judicial interference proceed to construct the storm sewer in any one of the manners approved by the Legislature for the construction of other and similar public improvements. In the instant case the city has decided to let a contract for the construction of the sewer. Under such circumstances I can perceive of no valid reason why the city should not be held to at least as high a standard of vigilance to see that the fund here involved is devoted to the purpose for which it was created as would be required if the fund were appropriated by the city from the general fund or were to be paid from a special tax or assessment. To say that the city has authority to fix a minimum wage which the contractor shall pay to his employees and require that he, so far as possible, dispense with the use of machinery in the one case, but that it does

not have such authority in the other, is, as it seems to me, without foundation in law or reason. Independent of statute, the city commissioners as trustees of the bond money are required to see that it is honestly, prudently, and economically expended for the construction of the storm sewer and for no other purpose. The effect of dispensing with the use of machinery and of fixing a minimum wage in the construction of public work by a contractor is a matter of far-reaching effect, and such power, if it exists at all, is with the Legislature and may not be exercised by the municipality independent of an express legislative grant.

It is further urged on behalf of defendants that the placing of the objectionable provisions in the contract here involved is justified because of the great number of persons out of employment. It is not the work of the courts or of the city commission to put humanitarian impulses into form of law at the expense of a fund created by the taxpayers for a special purpose. Nor is it by any means certain that impulses of humanitarianism point to the wisdom of approving contracts containing provisions such as are here complained of. We may take judicial notice, not only of the fact that many persons are out of employment, but we may also take judicial notice of the fact that the modern tendencies of our municipalities are to create more assessment districts, to issue more bonds, and to place greater and greater burdens upon property. Prosperity bought upon credit must eventually in the end force many of those who now own their own homes or their own business to give them up and at the same time deter others from buying homes or setting up in business. Authorities are not lacking who attribute the economic ills of today to the extravagance and waste of yesterday. The money derived from the purchase of sewer bonds comes from a citizenry who are equally deserving and whose number and needs may be equally as great when they are called upon to pay the bonds as are those who may secure employment on the contemplated improvement. Be that as it may, those who made it possible for the contemplated im-

provement to be constructed are entitled to have the money derived from the sale of the bonds which constitute a lien upon their property devoted to the purposes for which it was voted, and it is the duty of the city commissioners to see that it is so expended. Whenever trustees of a special fund purposely undertake to devote trust funds or any part thereof to a purpose other than that for which the fund was created it becomes the duty of the courts, upon application of an interested party, to arrest such undertaking. Our law does not recognize good faith or a lofty purpose as a legal excuse for diverting a special fund or any part thereof to a purpose other than that contemplated in the creation of such a fund. Exigencies do not change the rule. Nor is the rule relaxed by the pretense of keeping within it. The law looks to the substance, not to the form. The use of the money derived from the sale of the sewer bonds is limited to the objects and purposes of constructing a storm sewer. When, as here, it is admitted on behalf of the defendants that the sole purpose of requiring the greater part of the work of constructing the storm sewer to be done by hand labor, supplied by an agency created by the city, is to assist some of those who are unemployed, and when it is further conceded that because of such plan the cost of the improvement will be increased $55,000, there is no escape from the conclusion that the city commission, if permitted to carry out such plan, will purposely and effectively divert a part of the special fund to a purpose and object not authorized by the taxpayers who created the fund. To say that those who may work on the sewer under the proposed plan will earn the money paid to them does not answer the objection. So far as the plaintiff taxpayer is concerned, if he has no valid objection to the construction of the storm sewer under the proposed plan, I am unable to see how he could be heard to complain if the city were to construct the sewer in the usual way and then apply the money thus saved to some charitable or other purpose. In either event the property taxpayer will receive the same benefits and will be required to pay the

same amount of taxes towards the satisfaction of the principal and interest upon the bonds. To say that a special fund may be purposely depleted so long as such depletion is in some way connected with the object for which the fund is created is to say that substance must give way to form, and that one may do indirectly that which he may not do directly. Such doctrine is contrary to principles of law that are axiomatic.

FOLLAND, J. (disssenting).

I dissent.

The theory on which the writ should be denied may be briefly stated. The city has by delegation from the state plenary power to construct, maintain, and repair sewers. No limitations have been placed upon this power by the state. In the construction of this storm sewer the city acts in its capacity as an employer or proprietor and in such capacity may impose conditions as to the methods to be employed, the hours of labor, the character of the employees as to being citizens and residents, and the manner in which the work is to be done. In other words, the city may do with respect to these matters any and all things which the state itself might do. The questioned provisions in the contract are merely the employer's declarations to his employees of how, by what method, and in what manner, it desires its work to be done. The possession of the power to do the work being conceded a generous measure of its exercise will be permitted to the end that it may effectuate its purpose, and courts will not interfere except to see that the board has acted within the scope of its delegated power; that its discretion has not been abused; and that it was not actuated by fraud or bad faith. In its capacity as owner and proprietor the city is not hampered, where there are no statutory or constitutional restrictions, as to the manner or means to be employed in the construction of its public works. The conditions which an employer municipality may impose as to the manner of doing its work involves questions of policy which

are within the discretion of the board of commissioners to decide. With respect to questions of policy the courts have nothing to do. The increased cost of the improvement is not of such magnitude as to imply fraud or bad faith. On this question the courts may inquire into the reasons and circumstances which actuated or explain the conduct of the board. When the reasons are considered, they show that the board is motivated by considerations of public welfare. In determining what use shall be made of its money and the manner of construction of its public works, the city authorities have the right to consult and consider the welfare of its citizens, even though the conditions imposed do not exclusively promote the efficiency of the work where they do tend to promote the well-being of the citizens and residents of the city and enhance public welfare. The cases and arguments which support this theory are referred to later in this opinion.

The city was not required to advertise for bids and do the work by contract let to the lowest responsible bidder, and was therefore not restricted as to the manner in which the work could be done. It is a generally accepted rule of law that, in the absence of some statutory requirement to that effect, a municipal corporation is not required to call for bids and enter into contracts for the making of public improvements. *Utah Savings & Trust Co.* v. *Salt Lake City*, 44 Utah 150, 138 P. 1165; 3 McQuillin, Municipal Corps. p. 2634. Prior to 1919 by Comp. Laws Utah 1917, § 819, the city was required to do its work by contract and to let the contract to the lowest responsible bidder after publication of notice. *Utah Savings & Trust Co.* v. *Salt Lake City*, supra. This section, however, was amended by Laws Utah 1919, c. 14, p. 23, and by the amendment the requirement of letting of contracts was limited to work to be paid for out of the general fund.

The Legislature undoubtedly had the right to prescribe that all public work should be done by contract. But this it did not do. It was competent for the Legislature to limit the provisions of section 819 to work paid for out of general

funds, and, where so limited, it does not lie with the courts to extend the application of such provision to work paid for out of other funds. Particularly is this true where the section before amendment was held by this court to apply to all construction work done by the city, and thereafter the Legislature saw fit to amend the section and restrict its application to a particular class of work only. The courts will give effect to the legislative intent thus clearly expressed. *Dahl* v. *Salt Lake City,* 45 Utah 544, 147 P. 622. The cost of the storm sewers will be paid from a special fund created by the sale of bonds voted by the taxpaying citizens of Salt Lake City for this specific purpose.

The statutory definition of the term "general fund," Comp. Laws Utah 1917, § 5726, applicable to the state treasury, is as follows:

"The general fund consists of moneys received into the treasury and not specially appropriated to any other fund."

By the same token the general fund of a city is the fund which receives moneys from various sources and from which the municipal authorities may appropriate money for any corporate purpose, as distinguished from special funds which are dedicated by express statutory provision or by the board of commissioners, when duly authorized, to a specific municipal object and where such fund may not be diverted either directly or indirectly to any other purpose. 28 Cyc. 1563. This bond money will not go into the general fund of the city and cannot lawfully be diverted into such general fund. 6 McQuillin, Municipal Corp. (3rd Ed.) § 2462. The provisions of § 819, as amended, do not apply to the making of public improvements which are not paid for out of resources which are not and do not become a part of the general fund of the city. *Barnes* v. *Lehi City,* 74 Utah 321, 279 P. 878. The city could have proceeded without contract to do this work under the general direction of its own officers and employees. Under these circumstances it is not restricted by the same rules which would apply had the statute

required that the work be let by means of competitive bidding to the contractor offering the lowest responsible bid.

There is no question here with respect to the power of the city to pass general ordinances which control the conduct of its citizens generally, but merely whether the city in its capacity as an employer may direct the manner in which the work shall be accomplished. It matters not that the city did not pass an ordinance incorporating the provisions to which objection is made as applicable to all city work. That would be one way by which the city as employer could communicate its desires to its employees, but it may also do so by way of writing the conditions into a contract.

The language of Chief Judge Willard Bartlett in his concurring opinion in *People* v. *Crane,* 214 N. Y. 154, 108 N. E. 427, 434 L. R. A. 1916D, 550 Ann. Cas. 1915B, 1254, confirms this view, as follows:

"The statute is nothing more, in effect, than a resolve by an employer as to the character of his employees. An individual employer would communicate the resolve to his subordinates by written instructions or by word of mouth. The state, an incorporeal master, speaking through the Legislature, communicates the resolve to its agents by enacting a statute."

See, also, *Ebbeson* v. *Board of Public Education in Wilmington* (Del. Ch.) 156 A. 286, 289, wherein a provision in proposal for bids called by the board of education contained the condition that subcontractors must be bona fide residents of Delaware for at least six months prior to the award was held valid. The court said:

"I shall proceed to answer this question upon the assumption that the situation is just as though the condition against nonresident subcontractors was one that some statute of the state required the Board as a public agency to impose, instead of being imposed by the Board's voluntary will."

What, then, are the powers of the city? Comp. Laws Utah 1917, § 570x37 delegates to the city the power to construct and keep in repair culverts, drains, sewers, catch-basins,

manholes, and cesspools, and to regulate the construction and use thereof. This is a general grant of power without any limitation or direction as to how, when, or in what manner, or by what method, or under what conditions the city may do the work therein referred to. All such is left to the sound discretion of the board of commissioners. By section 570x87, commonly referred to as the General Welfare Clause, the board of commissioners is given power to make all regulations not repugnant to law necessary for the carrying into effect and discharging all duties and powers conferred by statute, and such as are necessary and proper to provide for the safety, preserve the health, promote the prosperity, and to improve the morals, peace, good order, comfort, and convenience of the city and its inhabitants. Section 570x2 provides for the appropriation of money and the handling of corporate property and is very broad in its definition of corporate purposes and delegation of power. By this section the board of commissioners is authorized:

"To appropriate money for corporate purposes only, and provide for payment of debts and expenses of the corporation; and to purchase, receive, hold, sell, lease, convey, and dispose of property, real and personal, for the benefit of the city, both within and without its corporate boundaries; to improve and protect such property, and to do all other things in relation thereto as natural persons; provided, that it shall be deemed a corporate purpose to appropriate money for any purpose which, in the judgment of the board of commissioners or city council, will provide for the safety; preserve the health, promote the prosperity, and improve the morals, peace, order, comfort, and convenience of the inhabitants of such city."

In the construction of this storm sewer the city is exercising the powers conferred upon it by statute as an employer or proprietor. The provisions in the proposed contract merely specify the employer's selection of its employees, and the method and manner in which the work is to be performed. No contractor is here complaining. In the contracts that have already been let the contractors have agreed to these provisions and have undertaken to abide by them, and, so far as the proposed contracts are concerned, there is no

complaint from any of the bidders with respect thereto. They are willing to bid and take the work on the terms prescribed. The question is raised by a tax-paying citizen who urges that the method employed is wasteful and extravagant and in effect amounts to a charity. He contends that the city is not the public agency empowered by state law to raise and expend money for charitable purposes. There is no question but that in this state it is the board of county commissioners which may levy a tax and expend the proceeds thereof for the purpose of providing for the indigent poor. We cannot see, however, wherein the construction of the sewer in the manner indicated is in any sense a charity. Charity is defined by Webster's New International Dictionary as "whatever is bestowed gratuitously on the needy or suffering for their relief; alms." The provisions with regard to employment of hand labor, the rotating of labor, and giving preference to citizens and residents of the city, are in no sense charitable in their nature, but come within the general scope of the power of the city as an employer to control the manner and method by which its public work shall be accomplished. While the amount of money which it is claimed will be wasted seems rather large, yet by reference to the whole amount to be expended it is comparatively small.

It is claimed that the provision with regard to rotation of labor and the requirement that certain of the work be done by hand labor will impose an additional cost upon the taxpayer. It is stipulated that in the engineer's estimate of the work these particular provisions were taken into consideration, and because thereof the engineer's estimate was increased by approximately $55,000, $20,000, of which is allocated to rotation of work and $35,000 to the employment of hand labor. All the bids so far received were substantially less than the estimate of the engineer, and it was represented to us in the oral argument that by rotation of labor there would actually be no increase in cost of the work.

I think no one would question the right of the board of commissioners to determine how and in what manner the

janitorial work should be done in the city and county building, and if the board determined that this work should be done by means of brooms and dusters instead of by vacuum cleaners, no one would question the right of the board to have its work done in that manner. That is a matter of policy particularly within the powers of the board. The problem here is practically the same, except that the amount of money involved is greater. In each case the legal question is merely whether the board of commissioners has power to prescribe the manner and method of doing corporate work in the absence of any restriction imposed upon it by statute. If it was within the discretion of the board to so prescribe, and its discretion has not been abused, or if its conduct is not tainted by fraud or bad faith, then this writ should be denied.

In determining whether municipal authorities have acted within their expressly granted powers, the courts follow a liberal rule, stated in R. C. L. as follows:

"Any fair and reasonable doubt concerning the existence of the power, or any ambiguity in the statute upon which the assertion of the power rests, is to be resolved against the corporation and the power denied. When, however, power over a particular subject matter has been delegated to a municipal corporation by the legislature without any express limitations, the extent to which that power shall be exercised rests in the discretion of the municipal authorities, and as long as it is exercised in good faith and for a municipal purpose, the courts have no ground upon which to interfere." 19 R. C. L. 768.

"Within the limits of their powers municipal corporations are favored by the courts; in such cases, rules of strict construction do not apply; nor do such rules apply when the power conferred in its exercise concerns only the corporation and can injure no one. The possession of the power being established, a generous measure of its exercise will be permitted to the end that it may effectuate its purpose." 43 C. J. 197.

"It seems to be well established by repeated adjudications that municipal corporations may exercise all powers within the fair intent and purpose of their creation which are reasonably proper to give effect to the powers expressly granted; and that in so doing they have the choice of the means adapted to the ends and are not confined to any one mode of operation." 43 C. J. 193.

Mr. Dillon, in his work on Municipal Corporations, says:

"Power to do an act is often conferred upon municipal corporations, in general terms, without being accompanied by any prescribed mode of exercising it. In such cases the common council, or governing body, neessarily have, to a greater or less extent, a discretion as to the manner in which the power shall be used. This discretion, where it is conferred or exists, cannot be judicially interfered with or questioned except where the power is exceeded or fraud is imputed and shown, or there is a manifest invasion of private rights. Thus, where the law or charter confers upon the city council, or local legislature, power to determine upon the expediency or necessity of measures relating to the local government, their judgment upon matters thus committed to them, while acting within the scope of their authority, cannot be controlled by the courts. In such case the decision of the proper corporate body is, in the absence of fraud, final and conclusive, unless they transcend their powers." 1 Dillon Municipal Corporations 5th Ed. § 242.

The statutes of this state have expressly granted power to the board of commissioners to construct storm sewers, and, as we have seen, no limitations have been placed upon this power. It follows, therefore, that the extent to which that power is exercised rests in the discretion of the municipal authorities. The officers of a municipality in the doing of publc work or the letting of municipal contracts perform, not merely ministerial duties, but duties of a judicial and discretionary nature, and the courts in the absence of fraud or a palpable abuse of discretion by the officers have no power to control their action. 19 R. C. L. 1067, note 17 Ann. Cas. 650. *In Atkin* v. *Kansas,* 191 U. S. 207, 24 S. Ct. 124, 127, 48 L. Ed. 148, after deciding that the state had power to prescribe the conditions upon which it will permit public work to be done on its behalf, or on behalf of its municipalities, said with reference to review of such action by the courts:

"No court has authority to review its action in that respect. Regulations on this subject suggest only considerations of public policy. And with such considerations the courts have no concern."

While that is generally true with respect to the exercise of power by the Legislature within constitutional limitations,

it does not mean that the power of the board of commissioners of a municipality is unlimited. The courts undoubtedly have the right to review such action to see that it is within the powers conferred, and that the board has not abused its discretion nor been actuated by bad faith or fraud.

"Courts cannot interfere with the discretion of municipal bodies in the expenditure of public funds unless it has been plainly abused and practically exceeded under pretence of keeping within their charter powers." *Torrent* v. *Muskegon*, 47 Mich. 115, 10 N. W. 132, 41 Am. Rep. 715.

, "While the necessity of a local improvement, its character and location, the method of construction, and material used are committed to the judgment of the city council, its judgment must be exercised in a reasonable manner in view of the circumstances and surrounding conditions." *City of Chester* v. *Kennedy*, 344 Ill. 224, 176 N. E. 430, 435.

In *Campbell* v. *New York City*, 244 N. Y. 317, 155 N. E. 628, 631, 50 A. L. R. 1473, the question involved the validity of proposed contracts which a taxpayer sought to restrain because of provisions within it prescribing rates of wages for an eight-hour day. The contracts were drafted pursuant to statutory requirements, but the conditions in the contracts were not confined strictly to the statutory provisions. It was claimed that the contracts were wasteful and illegal. The court said:

"Another form of contract might be more expedient or cheaper. The courts do not sit in judgment upon questions of legislative policy or administrative discretion. The taxpayer must point to illegality or fraud."

In *Jahn* v. *City of Seattle*, 120 Wash. 403, 207 P. 667, 668, in upholding as valid a city ordinance prescribing the rate of wages for an eight-hour day and a requirement that the contractor or subcontractor shall give preference to citizens of the United States and heads of families, the court said:

"The courts no more will attempt to say what wages must be paid upon public work, what hours of employment shall prevail, or the class of people who shall perform that work, than they will attempt to interfere and prescribe the material to go into the work, the manner of construction, or other engineering details of a public improvement."

This court has recognized the rule that, in the choice of materials *(Murphy* v. *Salt Lake City,* 65 Utah 295, 236 P. 680)*, and the engineering plans to be followed *(Ward* v. *Salt Lake City,* 46 Utah 616, 151 P. 905)*, in the construction of public works the courts will not interfere with the exercise of discretion by the municipal authorities, and has also held in *Brummitt* v. *Ogden Waterworks Co.,* 33 Utah 289, 93 P. 828, that, where a city is acting within its authorized powers, a taxpayer may not arrest its acts merely because such acts will be unwise, improvident, or extravagant; nor may he do this in any manner that is purely legislative or discretionary.

No serious question is raised as to the provisions prescribing an eight-hour day, fixing minimum wages to be paid, or the requirement of preference to citizens of the United States who are residents of Salt Lake City. The cases cited below afford ample support for these provisions. The requirement that preference be given on public works to citizens of the United States or those who have declared their intention of becoming such is required by statute, Comp. Laws Utah 1917, § 4865.

While there is no case that we have found or that has been called to our attention which passes directly upon the question of the city's power to prescribe what work shall be done by hand labor and providing for a rotation of labor, yet the cases which have decided that the state or city has power to prescribe with respect to public work, that eight hours shall constitute a day's work *(Atkin* v. *Kansas, supra;* In re *Broad,* 36 Wash. 449, 78 P. 1004, 1006, 70 L. R. A. 1011, 2 Ann. Cas. 212, and *Milwaukee* v. *Raulf,* 164 Wis. 172, 159 N. W. 819), fix a minimum wage to be paid *(Gies* v. *Broad,* 41 Wash. 448, 83 P. 1025; *Malette* v. *Spokane,* 77 Wash. 205, 137 P. 496, 51 L. R. A. (N. S.) 686, Ann. Cas. 1915D, 225) impose restrictions that citizens of a state or city shall be given preference *(Jahn* v. *City of Seattle,* supra; *Cornelius* v. *Seattle,* 123 Wash. 550, 213 P. 17; *Heim* v. *McCall,* 239 U. S. 175, 36 S. Ct. 78, 60 L. Ed. 206, Ann. Cas. 1917B,

287; *People* v. *Crane,* 214 N. Y. 154, 108 N. E. 427, 429, L. R. A. 1916D, 550, Ann. Cas. 1915B, 1254), or persons who have resided in the state six months or more *(Ebbeson* v. *Board of Public Education in Wilmington,* supra), preference in favor of war veterans *(State* v. *City of Seattle,* 134 Wash. 360, 235 P. 968), conditions of employment of teachers *(Seattle High School Chapter No.* 200 v. *Sharples,* 159 Wash. 424, 293 P. 994, 996, 72 A. L. R. 1215), that the work must be done in the city or state *(Matter of Rooney,* 26 Misc. Rep. 73, 56 N. Y. S. 483; *Tribune P. & B. Co.* v. *Barnes,* 7 N. D. 591, 75 N. W. 904; In re *Gemmill,* 20 Idaho 732, 119 P. 298, 41 L. R. A. (N. S.) 711, Ann. Cas. 1913A, 76), or where the manner or time of doing the work has imposed an additional cost *(City of Philadelphia* v. *Evans,* 139 Pa. 483, 21 A. 200, 202; *City of Chicago* v. *Hirschl,* 275 Ill. 60, 113 N. E. 899; *Wagoner* v. *La Grande,* 89 Or. 192, 173 P. 305, 307), are sufficiently analogous to furnish the reasons which sustain the exercise of power by the city to write all of the question conditions into the proposed contracts. In 44 C. J. p. 48, it is said:

"While the courts have condemned a contract provision requiring the contractor to employ union labor exclusively, they have upheld provisions requiring the contractor to employ only citizens of the city, to discharge employees who fail to perform their work in accordance with the specifications, to restrict the hours of labor to eight per day, and to pay a prescribed minimum wage."

In *Gies* v. *Broad,* supra, the court, in sustaining a prosecution for violation of a city ordinance prescribing a minimum wage for an eight-hour day on public work, stated its grounds of decision:

"For, surely, if it be within the power of the state to limit the number of hours a laborer may be permitted to labor in one calendar day on any public work undertaken by it, it can fix the minimum sum that shall be paid him as wages for such labor. The power to do either must rest on the principle that 'it belongs to the state, as the guardian and trustee for its people, and having control of its affairs, to prescribe the conditions upon which it will permit public work to be done on its behalf, or on behalf of its municipalities.'"

In re *Broad,* supra, the Washington court sustained a city ordinance prescribing an eight-hour day on public work upon the following grounds:

"But the decision was based upon an entirely new theory of the law, namely, that it was a public work on which the contractor was engaged, and with reference to which he contracted; that the state, or the municipalities through delegated powers from the state, had a right to do their work in any manner in which they saw fit, and that they had the same right to compel those with whom they contracted to perform the public work in the same manner, and that there was no question of violation of private right involved."

In *City of Philadelphia* v. *Evans,* supra, in sustaining the city's action in requiring paving to be done in the winter time, the court said:

"We do not, of course, know what public exigency required that this pavement should be put down at such an unusual season for such work. It is easy to see that it would not only increase the expense, but possibly impair the quality of the paving. We do not find anything, however, to interfere with the discretion of the municipal authorities in this matter, and we cannot assume that it was done without cause.

In *City of Chicago* v. *Hirschl,* supra, the city laid two water mains where it was contended that one would do just as well, and that the laying of two only increased the cost. The court said this did not amount to an abuse of discretion and it would not interfere unless clearly satisfied that the action was oppressive and without reasonable grounds.

In the leading case of *Atkin* v. *Kansas,* supra, the Supreme Court of the United States sustained an eight-hour law applicable to work done by the state or any of its municipalities on the broad ground "that the work being of a public character, absolutely under the control of the state and its municipal agents acting by its authority, it is for the state to prescribe the conditions under which it will permit work of that kind to be done."

In *People* v. *Crane,* supra, the question was whether the state had the right to prescribe that only citizens of the

United States shall be employed upon public work, and it was there held that such requirement violated no constitutional provision. In the course of the decision Judge Cardozo used the following language, which is appropriate to the question before us:

"Since government, in expending public moneys, is expending the moneys of its citizens, it may not, by arbitrary discriminations having no relations to the public welfare, foster the employment of one class of its citizens and discourage the employment of others. It is not fettered, of course, by any rule of absolute equality; the public welfare may at times be bound up with the welfare of a class; but public welfare, in a large sense, must, none the less, be the end in view. Every citizen has a like interest in the application of the public wealth to the common good, and the like right to demand that there be nothing of partiality, nothing of merely selfish favoritism, in the administration of the trust. But an alien has no such interest; and hence results a difference in the measure of his right. To disqualify citizens from employment on the public works is not only discrimination, but arbitrary discrimination. To disqualify aliens is discrimination indeed, but not arbitrary discrimination; for the principle of exclusion is the restriction of the resources of the state to the advancement and profit of the members of the state. Ungenerous and unwise such discrimination may be. It is not for that reason unlawful. * * *

"To defeat this law it must, therefore, be held that the Constitution gives to the state a narrower liberty of choice in the expenditure of its own moneys than in the use or distribution of its other resources. I can find no justification for the supposed distinction. The construction of public works involves the expenditure of public moneys. To better the condition of its own citizens, and, it may be, to prevent pauperism among them, the Legislature has declared that the moneys of the state shall go to the people of the state. * * *

"In saying this, I assume that the purpose of the statute is not to promote efficiency in the doing of the work, but to discriminate in the distribution of the public wealth in favor of the citizen. There may be forms of employment where efficiency would be promoted by the employment of citizens, and, if the statute were restricted to such employments, its validity would not be doubtful. * * * The statute has been frankly defended at our bar as a legitimate preference of citizens, not to promote the efficiency of the work, but to promote the welfare of the men preferred; and from that aspect it will be frankest and safest for us to view it.

"To concede that such a preference was intended is not to condemn the statute as invalid. The state, in determining what use shall be made of its own moneys, may legitimately consult the welfare of its own citizens, rather than that of aliens. Whatever is a privilege, rather than a right, may be made dependent upon; citizenship. In its war against poverty, the state is not required to dedicate its own resources to citizens and aliens alike. \* \* \* In our own country the workmen's compensation laws that have been adopted in many states are phases of the same world-wide movement. We are not concerned at this time with the validity of these measures for the alleviation of the laborer's lot. We mention them as illustrations of an expanding consciousness in the modern state that relief against unemployment, both after the event and before it, is part of the state's function. \* \* \* Preferences to avert a threatened pauperism, or to render pauperism impossible, stand on the same footing. In each instance the state announces as its public policy that the common property shall be used for the benefit of its common owners."

And Chief Judge Willard Bartlett, in his concurring opinion in the same case, uses the following language:

"These decisions establish the proposition that the state in the prosecution of a public work stands in just the same position as an individual; that it may prescribe the conditions on which it will contract for such work; and that it may make the violation; of his contract on the part of the contractor a criminal offense. It is so held in *Atkin* v. *Kansas*, 191 U. S. 207, 223, 24 S. Ct. 124, 128, 48 L. Ed. 148, where the Supreme Court of the United States said that: 'No employee is entitled, of absolute right and as a part of his liberty, to perform labor for the state; and no contractor for public work can excuse a violation of his agreement with the state by doing that which the statute under which he proceeds distinctly and lawfully forbids him to do.' \* \* \*

"In *Ellis* v. *United States*, 206 U. S. 246, 256, 27 S. Ct. 600, 601, 51 L. Ed. 1047, 11 Ann. Cas. 589, which involved the validity of a federal labor law, it was held that: 'The government, purely as a contractor, in the absence of special laws, may stand like a private person, but, by making a contract it does not give up its power to make a law.' And in the exercise of this power it may declare a violation of his contract by the contractor to be a crime. In answer to a suggestion that the purpose of the statute was to secure to labor certain advantages in conditions over which Congress has not general control, Mr. Justice Holmes said that the existence of such a motive, would not render a law unconstitutional which was otherwise valid, and

that the power which Congress has over the mode in which contracts with the United States shall be performed could not be limited by a speculation as to motives.

"However, subsequent legislation or adjudications may have modified the effect of the decision in *People* v. *Orange County Road Construction Co.*, 175 N. Y. 84, 90, 67 N. E. 129, 131, 65 L. R. A. 33, it still remains true, as was said by Judge Cullen in that case, that: 'If the state itself prosecutes a work it may dictate every detail of the service required in its performance; prescribe the wages of workmen, their hours of labor, and the particular individuals who may be employed. * * * The state in this respect stands the same as its citizens.' "

Judge Seabury, also concurring, said:

"In its capacity of owner and proprietor, the state is not hampered by restrictions as to the manner in which it shall cause its public works to be constructed. There are many uses to which an owner or proprietor may put his property which do not violate the rights of others. The state in its capacity of proprietor or owner may make such use of its own public property as it deems conducive to the social well-being. In the use that it makes of such property it is not required to refrain from discrimination. The largest measure of benefit may sometimes result from discrimination. Whether or not discriminations made in regard to public property sustain a relation to the public welfare is for the Legislature, and not the courts, to determine. The modern state, through the ownership of its public property, affords opportunities for public co-operation. The motive which actuates it is service—not profit. Its service, to be effective, must be rendered where it is needed, and in rendering it it is not obliged, in the use of its public property, to secure immediate equality of benefits to all; it is sufficient if the ultimate result be to promote the general welfare. The public property or commonwealth should, of course, be used to promote the general welfare, but the restraints or checks to which government is by constitutional provisions subjected, when its acts in reference to private property, have no application where it acts in relation to public property. Within this sphere and in regard to this public property, government is free to prescribe such regulations as will best promote the general welfare."

*Norris* v. *City of Lawton*, 47 Okl. 213, 148 P. 123, 124, is to similar effect. The court sustained a statute regulating hours of labor and compensation to laborers employed by the state and its municipalities. It is was there held that:

"No person has a vested right to work for the state or any of its municipalities upon public works; but this is rather a privilege granted by the state or municipality, and may be granted upon such terms and conditions as the state may see fit, not in conflict with the law. And this is true whether the work be done by the state or municipality directly, or be done through the medium of a contractor who holds a contract with the state."

I have quoted extensively from these cases for the reason that the principles therein announced are applicable here. True, these decisions relate to powers exercised by a state in prescribing conditions of employment on public works. A municipality, while exercising the powers delegated to it by statute, where there is no restriction with respect to the manner and means of doing the work, stands in the same position as does a state as an employer and may prescribe the conditions upon which public work will be done for such municipality.

In *Milwaukee* v. *Raulf*, 164 Wis. 172, 159 N. W. 819, 822, the defendant was prosecuted and convicted for violation of a city ordinance relating to hours of labor on municipal works. There was a state law which limited the hours of labor on public works contracted for by the state, but which did not reach and control the work done for municipal corporations. The court said:

"It being established that the state has the power to limit the hours of labor on public works including public works for its municipalities, has the city of Milwaukee such power?

"The power to prescribe the conditions upon which public work shall be carried on is undoubtedly primarily in the state. When the state speaks its voice is law. The city is simply an agency of the state, and as such has only such powers as are conferred upon it expressly or by implication. The state of Wisconsin has not attempted to prescribe the conditions under which public work shall be carried on within the cities of this state. Cities are charged with the power and duty of determining the necessity for public works, their extent and character and subject to the constitutional limitation as to indebtedness and certain prescribed rules of procedure, the whole subject of providing for public works within a city is committed to the common council of the city. The whole matter of providing public works being

delegated to the city, the city has, as an incident to its power to contract for the erection and constrution of public works, the same inherent power to prescribe the conditions under which the work shall be carried on within the city, in the absence of any restriction by the state, that the state has, and it may exercise this inherent power unless and until it is restricted by legislative enactment.  *  *  *

"Without expressing any opinion, impliedly or otherwise, that such is the fact, if legislation of the character now before us is mischievous in its tendencies and results in increased tax burdens, the remedy rests with the people themselves. The remedy is legislative and political and is not to be found in the judicial field. The field of legislative discretion is broad, and as long as legislative bodies stay within its limits their enactments are the law of the land. We conclude, therefore, that the ordinance in question is valid, and that the defendant was properly convicted and sentenced."

To similar effect is *Malette* v. *Spokane,* 77 Wash. 205, 137 P. 496, 502, 51 L. R. A. (N. S.) 686, Ann. Cas. 1915D, 225, wherein a municipal ordinance was declared valid which fixed a minimum wage per day for eight hours labor on public contracts, even though such wage as fixed was 25 per cent higher than the prevailing price for labor. The court in its opinion declared that the ordinance was sustained upon the principle that, when the state or any of its municipalities performs public work, it then, as an employer, has the right to fix the terms upon which it will permit labor to be done for it, and used the following language:

"It is thus plain that there is ample authority to be found, both in state and federal decisions, to sustain the power of the legislative body, either of the state or of the city, to prescribe a reasonable minimum of wages even above the going rate for common labor performed on public work, and even when the work is to be paid for by special assessments against the property benefited thereby, and the courts have no power to pass upon the wisdom of the measure.  *  *  *

"While cogent reasons might be advanced for sustaining legislation of this character as a proper exercise of the police power of the state delegated by our Constitution to cities of the state, we find it unnecessary to place the decision on that ground or to discuss that question, since the state courts to which we have referred and the Supreme Court of the United States have sustained legislation, which cannot be distinguished either in principle or in effect from the ordi-

nance here in question, upon the simple ground that 'it belongs to the state as the guardian and trustee for its people, and having control of its affairs, to prescribe the conditions upon which it will permit public work to be done on its behalf, or on behalf of its municipalities.' *Atkin* v. *Kansas*, 191 U. S. 207, 48 L. Ed. 148, 24 S. Ct. 124; *Gies* v. *Broad*, 41 Wash. 448, 83 P. 1026.  *  *  *  Hence, assuming no increased efficiency by reason of fewer hours of work, the law would either increase the number of men simultaneously employed at the same rate of pay as for ten-hour days, or would increase the number of days of employment for the same number at the same rate. It follows that it tends to increase the cost of work in exact proportion to the fewer hours in the working day. The eight-hour law manifests a public policy on the part of the state to better the condition of laborers employed upon public work. The purpose of the minimum wage ordinance is precisely the same, and the policy which sustains the one warrants the other. We fail to find wherein the ordinance in question is contrary to any public policy of the state, either as declared or implied in any statutory enactment.  *  *  *  But the discussion of this phase of the question would seem to be largely academic, since, even if the work be considered purely a matter of private concern to the city, it, like any other person, can prescribe the terms upon which it will contract.  *  *  *  Obviously, if it is left to the discretion of the council to determine what elements of cost shall enter into the work, and whether the work shall be done by contract at all, or whether by the city itself and the cost assessed to the property benefited, and, if done by contract, there is no requirement that it be let to the lowest bidder, then the rule stated by Hamilton would have no application. So long as the council acted in good faith, a general law or a general ordinance not unreasonably increasing the cost of the work would not invalidate the assessment.  *  *  *  It would seem that the discretion of the city, in so far as not controlled by 'its charter, and, so long as it is exercised in good faith, and not in such manner as unreasonably to increase the cost of the work, will not be interfered with."

*Seattle High School Chapter No.* 200, *etc.* v. *Sharples,* supra, was concerned with the power of the directors of a school district to place restrictions in the contracts of employment of teachers against being members of a certain association. The court held that the board had the complete power to impose conditions and prescribe qualifications of teachers employed, because, while the school district acting through its directors can only exercise powers granted or ex-

pressly or necessarily implied or essential to the declared objects of a municipal corporation, yet, where the power was expressly granted by statute to employ and discharge, it rested within the discretion of the directors to say whom it would employ and to impose conditions of employment. The decision was based upon the principles announced in *Jahn* v. *Seattle,* supra, *Malette* v. *Spokane,* supra, and *Atkin* v. *Kansas,* supra, to the effect that the right rests upon the simple ground that "it belongs to the state as the guardian and trustee for its people and having control of its affairs, to prescribe the conditions upon which it will permit public work to be done on its behalf, or one behalf of its municipalities." Because objection was urged that such requirements to be effective must be imposed by statute, the court said:

"But the argument is made that if any such right as that involved in the resolution is exercised, it must be by the Legislature and not by the school board. But we have noticed that express power has been given to the board to employ teachers, and we find nothing in the Constitution or statutes limiting that right so far as this case is concerned, from which it follows, we think, that the board has full and complete power in that respect."

"A municipal ordinance prohibiting more than eight hours per day on any work done for the municipality is likewise valid because the municipality has the right to do its work in any manner that it pleases and to compel those with whom it contracts to perform the work in such manner." 16 R. C. L. 495.

If the board might pass an ordinance prescribing the manner of doing its work, it may certainly do so by means of contractual provisions as any individual might do.

"Municipal ordinances or regulations of a contractual character are subject to judicial investigation in the same manner and for the same purpose as the contracts of private corporations." 43 C. J. 297.

In *Dovel Co.* v. *Village of Lynbrook,* 213 App. Div. 570, 210 N. Y. S. 183, 184, it was said:

"In the absence of some statutory requirement or evidence of bad faith, it [board of trustees] was entitled to use its judgment in

awarding this contract to the same extent that an individual would be."

The Supreme Court of Oregon in sustaining a levy of a special assessment for public improvement in the case of *Wagoner* v. *City of La Grande,* supra, said:

"It is contended that the price to be paid for the work was excessive. As to this contention it is enough to say that the price is not so grossly excessive as to imply fraud, and in the absence of such a situation the price was within the discretion of the council."

The estimated additional cost in the instant case is a comparatively small percentage of the total amount to be expended for the construction of the sewer, and, as I view the situation, is not so excessive as to either imply fraud or indicate that the board of commissioners had abused its discretion. Nor was its conduct so arbirtrary and capricious as to require the court to halt the execution of these contracts by the board of commissioners and deny it the power to construct the storm sewer by the methods proposed. In almost every piece of work undertaken by the city or contract let by it, some taxpayer might be able to demonstrate that, if different means were employed or other materials used than those designated by the board of commissioners, the work might be more cheaply done or the improvement better serve the purpose for which it is constructed. All such questions are questions of policy which are for the city authorities to decide, and, unless they exceed their powers or abuse their discretion, the courts will not substitute its judgment for theirs. This would be true, even if we did not know the reasons which actuated the board in making the proposed contracts. With that information before us we can say that, not only were the motives of the board of commissioners not bad, but were wholly good, and its action was taken for the avowed purpose of ministering to the general welfare of the community, and for this the board is to be commended and not condemned. That such reasons are appropriate to be considered by this court for the pur-

pose of determining whether the exercise of discretion by the city board has been abused or whether it has been actuated by fraud or bad faith is supported by authority. In 16 R. C. L. 499 it is said: "A court which has upheld the validity of minimum wage laws as to work done in behalf of a city, has pointed out that cogent reasons can be advanced for sustaining legislation of this character as a proper exercise of police power." Citing *Malette* v. *Spokane,* supra. In support of this view I refer to language of the judges in *People* v. *Crane,* supra, from which I have quoted extensively above.

In the case of *Atkin* v. *Kansas,* supra, the Supreme Court of the United States settled the question as to the power of the state to prescribe hours of labor to be performed by employees on public work, and this was decided on the ground that the state as the guardian and trustee of its people and having control of its affairs may prescribe the conditions upon which it will permit public work to be done upon its behalf or on behalf of its municipalities, and said that no court has authority to review its action in this respect, since regulations on this subject suggest only considerations of public policy. While the decision was based upon that ground there is language used by the court which indicated that it might also be based upon the ground of promotion of the general welfare of the workmen and as tending to produce a better citizenship. The cases to which we have referred are analogous in principle and sustain the view that the municipality as an employer may prescribe the conditions upon which the work will be done, and that the courts will not interfere with the exercise of discretion in this respect except for a flagrant abuse of discretion or where the action of the governing authorities is tainted by fraud or bad faith. The suggestion in the cases that the city authorities may consider the general welfare in the making of its contracts is pertinent to the situation before us and I think we may consider the emergency which has called forth the writing of these provisions, which are questioned,

into the contract for the storm sewers. We have been advised by counsel and may also take judicial knowledge of the facts that thousands of men are now out of work, and that there is impending a crisis such as seldom arises in the history of a people. These conditions are world-wide and are of most serious import. They are so acute and unemployment is so widespread that public officials are required to take notice of the fact that, unless employment is afforded to workmen, and particularly those who have families dependent upon them, the seeds of revolution may be sown. The condition is so serious that we may take judicial notice that our entire industrial and economic structure is being undermined and even the foundations of government are none too secure. That such matters may be judicially noticed is unquestioned.

"The courts will take judicial notice of general economic and commercial history between certain dates, the increase of the cost of living, and the prevalence in a particular year or years of a severe financial panic and industrial depression throughout the country, or a large section thereof." 23 C. J. 117.

While the storm sewers which the city contemplates building are, and have been for many years, a necessity and will serve a useful and convenient purpose, nevertheless the board of commissioners determined to cause such public improvements to be constructed during this winter for the express purpose of relieving the unprecedented condition of unemployment now prevailing. It thereupon submitted its proposal to the people who voted the bonds for the purpose of constructing such storm sewers. The citizens were well advised, not by the specific terms of the proposal submitted to them for vote, but by declarations publicly made by the mayor and the board of commissioners and other public spirited citizens who were interested in providing employment for unemployed workmen in this locality, that, if the bonds were issued, the work would be speedily undertaken and diligently prosecuted, and that conditions would be written into the contracts providing for the use of the maximum

number of laborers that could be well used on the enterprise. I do not pretend to say that the requirement of hand labor instead of machinery in the excavation and back filling for the sewers is ordinarily an economical or sound policy. That is for the board of commissioners to say in the light of the conditions now existing. Society must solve the problems which arise from the use of modern machinery and efficient methods of production, not by discarding such instrumentalities, but by making use of them for the benefit of all. In view of the present emergency, the requirements for rotation of labor and that certain work be done by manual labor were prescribed in the exercise of a sound discretion. In view of this situation, we cannot say that the board abused its discretion, or that its action was arbitrary or capricious in any respect whatsoever. There is nothing in the record which points to bad faith or fraud. On the other hand, the action of the city authorities was well considered and under the circumstances wisely conceived. In such times as these, municipal authorities may well be subject to criticism and condemnation if they fail to move in the direction of doing all that lies in their power to meet the crisis of unemployment and as best they can alleviate the suffering of the people, not by charity or doles which is beyond their power, but by means of providing work on public improvements. The people do not want charity but do desire to support themselves and their families by honest labor. It would be an indictment of our civilization if public officers under such circumstances have no means of meeting the situation and particularly where, as here, the city authorities have proceeded only within the powers granted them by the Legislature and are not violating any law enacted to place a limit upon their powers.

The writ should be denied.

CHERRY, C. J.

I concur in the views expressed by Mr. Justice FOLLAND in his dissenting opinion.